MARY CHASLAVKA, Appellant, v. FRANK MECHALEK AND
ANNIE MECHALEK.

**Deeds:** INCOMPETENCY OF GRANTOR: EVIDENCE. The evidence in an action to set aside a deed is considered and held to show that the grantor was possessed of insufficient mental capacity to make a deed.

**Evidence:** DECLARATIONS OF HUSBAND OR WIFE. Where a husband and wife are joint parties to an action, the declarations of either are

admissible against the declarant, notwithstanding the provisions of Code, section 4604.

*Appeal from Humboldt District Court.*— HON. A. D. BAILIE, Judge.

FRIDAY, APRIL 8, 1904.

ACTION to partition real property. Defense, that the defendants were, as tenants in common, owners of the entire premises, with prayer for defendants that title be quieted in them as against plaintiff. Decree for defendants, from which plaintiff appeals.— *Reversed.*

*Endicott & Pratt* and *J. J. Mosnat,* for appellant.

*Botsford, Healy & Healy* and *Prouty, Coyle & Prouty,* for appellees.

McCLAIN, J.— This action was originally brought by Mary Chaslavka and Frank Chess to secure partition of a certain tract of land of which their brother Michael Chess had died seised; the allegations of the petition being, in general, that the two plaintiffs and the defendant Annie Mechalek were the sisters and brother of decedent, and his heirs; that he died intestate, seised of the premises; and that each of the three heirs named became possessed by inheritance of a one-third interest in said premises. The defendants, who are husband and wife, set up a claim of title to the entire premises under a deed made to them in 1897, and, as an independent defense and claim of title, allege that in 1891 the deceased had executed a will devising one-third of his estate to plaintiff Mary Chaslavka, and two-thirds thereof to the defendant Annie Mechalek. The plaintiffs, by way of reply, pleaded that at the time of the execution of the will, and also when the deed was executed, the deceased, Michael Chess, was of unsound mind and incapable of executing either a will or

deed.   Subsequently, in a probate proceeding in the same court, the will was admitted to probate, over the objection of Mary Chaslavka and Frank Chess that the deceased was mentally incapable of executing a valid will, whereupon Frank Chess dismissed the action so far as he was concerned, and the case was tried as between Mary Chaslavka and Frank and Annie Mechalek on the issue as to the validity of the deed.   The court found that the deceased was possessed of sufficient capacity to execute a valid deed, and entered a decree for defendants, and the appeal is from this decree. The pleadings presented some issues not tried, which need not be considered on this appeal.·   The sole question now before us is as to the mental capacity of the deceased at the time of the execution of the deed.

On the trial the evidence on each side was presented by depositions, and, as the case is in equity, we must try it *de novo* on the evidence thus presented, as embodied in the record, without regard to the conclusions of the trial court.

The bearing of the testimony of the witnesses, and the effect to be given to it for the purpose of reaching a satisfactory conclusion, can be understood and appreciated only by a chronological presentation of the facts relating to the mental condition of the deceased during the period of his life to which the evidence relates. It appears that he was, by nationality, a Bohemian; that he had very little, if any, education, and spoke the English language quite imperfectly.   Upon attaining the age of some twelve to fifteen years, he became afflicted with epilepsy, and had the fits characteristic of that disease with more or less frequency, and, as it appears, with increasing frequency and violence, until·the,time of his death, in the year 1900. While still a young man he inherited some property from his father, and for a time after his father's death resided with his brother and sisters in Benton county.   It appears from depositions of several witnesses who were associated more or less intimately with him while in Benton county

1. DEEDS: incompetency of grantor; evidence.

that he was mentally dull and stupid, and comprehended with difficulty what was said to him, and entered into conversation but slightly, under any circumstances, with his associates. It appears that he was engaged with his brother-in-law and sister in carrying on the farm which had been owned by his father, but there is practically no showing that at this time he engaged in business transactions on his own responsibility. In the year 1891 the deceased, accompanied by one Fullmer, the husband of an aunt, went to Humboldt county and purchased a tract of land, constituting the principal part of the real estate of which he subsequently died seised. He made this purchase in part with money derived from the sale of his interest in the Benton county farm, which had belonged to his father, and in part with money furnished by his sister Annie, who was at that time unmarried. It appears that he had previously inspected the land in company with the defendant Frank Mechalek, who was already living with the Chesses, and who had gone with him to investigate land in Minnesota and northwestern Iowa. In the purchase of the land, Fullmer conducted the negotiations, and also accompanied the deceased to a lawyer's office in Humboldt, where the will was executed to which reference has already been made. The testimony relating to the entire transaction involving the purchase of the land and the execution of the will shows that deceased did little, if anything, more than to indicate his acquiescence in and approval of what was done in his behalf by Fullmer. Within two years after the purchase of the land, defendant Frank Mechalek had intermarried with Annie, the sister of the deceased, codefendant with her husband in this case, and the couple had gone to reside on the land in Humboldt county purchased by the deceased, as already stated; and from that time on the deceased resided with them on the land, and engaged with them in carrying on the usual farming operations. Nowhere does it appear what arrangements were made as to the division of profits, but deceased and Frank Mechalek seem to have acted jointly

in whatever business was done, connected with the carrying on of the farm. Indeed, it appears that Frank Mechalek assumed the greater share of the responsibility in business transactions.

Many witnesses testify as to the mental condition of deceased from 1891 to about 1895 or 1896, expressing the conclusion that during that time he was mentally sound, but the facts disclosed show a very slight foundation on which to base any competent judgment as to his mental capacity. The transactions referred to were very simple ones — such as the sale of grain hauled from the farm to the usual dealers in the market town, the purchase of a few loads of coal, and the purchase of a team of mules; and on cross-examination it was developed that in several instances the deceased was simply carrying out arrangements entered into when he and his brother-in-law had been together, and his brother-in-law had taken the active part in the negotiations. Not one of the witnesses testified to any extended conversation or dealings with deceased, and they agree in speaking of him as being uncommunicative, and carrying on whatever conversation or transaction he was engaged in by affirmative and negative words or signs in response to what was said to him. The witnesses seemed inclined to attribute the reluctance or inability of deceased to carry on a conversation or engage in a business transaction to a difficulty in using the English language, but the brother-in-law and one or two other witnesses refer to him as speaking English with reasonable ease, although his conversation with his relatives seems to have been usually in Bohemian. We are inclined to think, in view of the entire evidence, that the difficulty of holding conversations or engaging in any kind of intercourse or business transaction with deceased was due to a continuation of the dullness and stupidity observed by witnesses while he still resided in Benton county, rather than his inability to use the English language. Some of the witnesses who testified as to his mental condition while in Benton county were themselves Bo-

hemians, and their impression as to his lack of sense was not due to any inaptness on his part in the use of English. Nevertheless we are inclined to accept for this case the conclusion of the trial court in the probate proceeding that the deceased had in 1891 sufficient mental capacity to execute a will; and it becomes, therefore, important to notice carefully the testimony relating to his mental condition about the time the deed was executed, in 1897.

It appears that, in May of that year, application was made to the board of commissioners of insanity of Humboldt county to have the deceased committed to the hospital for the insane at Independence, and, on an investigation by the board, such commitment was ordered, and deceased became an inmate of that institution, where he remained for four months. During this time he came under the personal care and observation of Dr. Hill, the superintendent of the institution, who testifies that during the time deceased was an inmate he was insane, and that he was discharged as not cured; that the form of his mental disease was epileptic insanity, and that his mental condition remained practically unchanged during his period of treatment; that he was incompetent to do business of any kind or to dispose of property; that the disease is in its nature progressive; and that especially when the patient has been afflicted from childhood his mental faculties are thereby seriously impaired. Dr. Hill was the only witness testifying as an expert, and his testimony related to the mental condition of the deceased as he knew him, and also hypothetically to the effect of epilepsy as impairing the mental faculties, and we are disposed to give considerable weight to the conclusions stated by him. His explanation of the nature and effect of epilepsy leads us to believe that it was natural and to be expected, that from 1891, when deceased purchased his farm and made his will, until the year 1897, when he came under the witness' personal observation, his mental condition had materially changed

for the worse.    As bearing on his condition just before he was committed to the hospital for the insane, we have very significant evidence from the defendants themselves.    Frank Mechalek testified before the board of insane commissioners, as shown by the record kept by the clerk of the board, that the epileptic attacks occurred as often as three or four times a week; that, on the day before complaint was made, the deceased had become violently insane while going out to the field to work, and that on this occasion he commenced to yell and wave his hands and run around in the field, and had to be taken by force and carried into the house and locked up; that while in the house he broke the stove to pieces and " tore around generally "; that he could never be trusted, and had to have a great deal of care and attention.

Several letters written by Annie Mechalek to her sister, the plaintiff, during the year 1897, with reference to the condition of the deceased, are in evidence, and from these we gather that his conduct was peculiar, and noticeably so, not only to the defendants, but to others, so that " folks were afraid of him," and thought it dangerous for him to be about the house.    She says that, when they wanted him to do some work, they must go with him, and tell him what to do and how to do it.    The first letter, from which we have quoted in substance, was written two months before deceased was taken before the board of insane commissioners.    In a letter written about one month before his commitment, she says with reference to deceased:    " He is about the same.    Where we put him in the morning, there we find him at night."    " I'm all excited over Mike, he is half deaf and half dumb."    " We have to look after and watch him all the time.    He has got two hundred and eleven acres of land, awful nice land; it is all in his name."    " We had a hand only two months this year, but it is too hard on Frank to work two hundred acres himself and attend to Mike.    When he goes any place, he has to take Mike along with him for he isn't safe for us to leave him.    It is awful bad with Mike but we cannot help

it; he has to stay somewhere." With reference to the immediate circumstances which led to his being committed to the hospital, she says in another letter: " Mike got crazy and we had to go to our neighbors, but we tied him with ropes." " We sent for the best doctor twice and he said he could do nothing for him. He said we must send him off to the asylum." In a letter written while deceased was in the asylum, she said: " Mike haint home. He is out there yet and he must have a guardian to settle his things. We could point out how we wont, but me and Frank can't be so we would like to have you for a guardian. You know you get $10 from every $100. We could have lots of guardians out here, but we don't like to give a stranger such a good job when you can have it. Maybe you could make $200 in a short time. Now make up your mind and be one. But, of course, you would have to come out here this summer. But your (expenses) will be paid." In December, 1898, she wrote as follows: " You know that Mike is home now. He is home one year and three months. Frank went after him and brought him home. Mike's expenses cost $200." " He is not safe a minute, all the folks around here is afraid of him. We have to watch him day and night." " He gets a fit sometimes three times in one night." " We have awful bad trouble with him. Oh, how I wish you could see him; how funny he is. He don't know nobody but us. He talks very little. He works little but his work haint much account. Folks tell us to send him away, but Frank says he will keep him as long as he can. But I am awful afraid of him. He gets awful funny spells. I tell you my hands is full of work and my eyes is busy watching Mike." We have not attempted to set out these quotations in the exact phraseology used, but have transcribed them in accordance with their evident meaning.

Taking all the evidence together, and having in mind the progressive nature of the disease with which the deceased was afflicted, and the effect of such disease on the mental

faculties, as testified to by Dr. Hill, we reach the conclusion that when deceased executed the deed to defendants, in September, 1897, within two or three weeks after his return from the hospital for the insane, he was not possessed of sufficient mental capacity to execute a valid deed. The circumstances attending the execution of that deed lend support to our conclusion. It was prepared by a notary public under the direction of defendant Frank Mechalek, and the only part taken in the transaction by the deceased was to assent to it by some affirmative word or gesture after it had been read and explained to him, and to affix his mark. There is not the slightest evidence that he had any comprehension of the consequence and effect of the act. It was not prepared as the result of any conference with him on the part of the notary public who drew it so far as the record shows. It should be stated further with reference to this deed that, while it recites a consideration of $5,000, it is shown by the evidence that the only real consideration, as appears from the testimony of defendant Frank Mechalek, was an agreement on the part of the latter to pay the debts of deceased and furnish him support during the remainder of his life. At the time deceased was indebted to defendant Annie Mechalek, as evidenced by a note for $1,238, secured by a mortgage on the land. There is some indication in the evidence that he was otherwise indebted, but it does not appear what amount of debts, if any, has been paid by defendants under the agreement which Frank Mechalek claims to have made. Indeed, the entire testimony of this witness (and his is the only testimony with reference to the agreements relied on as a consideration for the deed) is evidently incompetent, as relating to a transaction with deceased.

We ought to say further that the only competent evidence relating to any intention on the part of deceased to execute such a deed, or that it was executed in pursuance of any previously formed intention, is found in the testimony of one McCullum, who went with Frank Mechalek to bring de-

ceased back from the hospital, and that of Annie Mechalek.
McCullum testifies that deceased said "he did not like it
there; he didn't like the place like his home with Annie,
and that if he stayed there the place would get his property
and he did not like it." "He said he would rather Annie
had his property than that place down there." But it appears
that he did not at that time say he would make any disposition
of his property. The same witness testifies that while he was
working on a granary on decedent's farm, after deceased had
been brought back from the hospital, and before the deed
was executed, deceased expressed his intention to transfer
his property to his sister. Annie Mechalek testifies that on
one occasion, soon after deceased came back from the hospi-
tal, she heard a conversation between him and McCullum
in which deceased said: "I will give all the property to
Annie, and stay here. I like it better here than I do down
there. I do not like it down there." She also testifies to a
conversation between deceased and her husband, one morn-
ing after deceased came back from the hospital, in which
deceased said to her husband: "To-day is a nice day. Let
us go and fix the deed." And further: "I will deed you
the property, and make my home here, and you shall pay all
my debts, if you want to." To which her husband replied:
"If you want to, we will go and fix it — make the deed."
We have only attempted to give our conclusions as drawn from
the testimony, which is set out in about 250 pages of printed
abstract, but a fuller discussion of the evidence would be
useless. We have carefully read it, and have discussed it at
perhaps greater length than is justified by the nature of the
case. Some questions of law as to the admissibility of por-
tions of the evidence referred to are raised by objections
taken and argued by counsel for appellee, and to these it
will be necessary to give brief attention.

In behalf of Frank Mechalek, objection was made to
the introduction in evidence of the letters written by Annie
Mechalek to the plaintiff, on the ground that Annie Mechalek

was the wife of Frank Mechalek, and her testimony was
inadmissible as against him, and also that as to
him her declarations were not competent, being
the declarations of another, and not in any
way binding upon him; and similar objections were made on
behalf of Annie Mechalek to the record of the proceeding
before the board of insane commissioners, showing the testi-
mony of Frank Mechalek in that proceeding.   So far as these
objections were based upon the relationship of the parties
as husband and wife, they were not well taken.   Where
husband and wife are joint parties in an action, the testi-
mony or declarations of one of them are admissible, notwith-
standing the provision of Code, section 4606, that " neither
the husband nor wife can be, in any case, a witness against
the other."   See *Richards v. Burden,* 31 Iowa, 305, in which
case the court says the fact that the wife's interests in the
action are connected with those of the husband does not
give him the right to object to her examination as a witness,
and that the argument against the right of plaintiff to exam-
ine the wife is completely answered by the consideration of
the fact that she is called to testify in her own case as to
matters affecting her own interests and property.   We think
similar considerations are applicable to the admissibility
of the declarations of the two parties looked upon as declara-
tions as against interest.   It is true that the declarations of
Annie Mechalek were not admissible against the husband, but
they were admissible against herself; and, conversely, the
declarations of Frank Mechalek were admissible against him,
though they could not be considered as against his wife.   We
cannot believe that these declarations must be entirely ex-
cluded merely because the setting aside of this deed on the
ground of mental incapacity, to which the declarations of both
related, would affect the interests of both parties.   It would
be strange, indeed, if the mere existence of an interest in the
validity of the deed, common although not joint, would render
inadmissible declarations which, as to each taken separately,

would be absolutely conclusive. We are cited to cases in which it has been held that declarations of one of two or more devisees or legatees as to the mental capacity of a testator are not admissible, because they might affect the interests of the other devisees or legatees. See *In re Will of Ames,* 51 Iowa, 596; *Dye v. Young,* 55 Iowa, 433; *McMillan v. McDill,* 110 Ill. 47. But we are not referred to any case similar to the one before us. We might assent to the proposition that if the case for setting aside the will as to Annie Mechalek was made out by evidence of her declarations, but no case was shown for setting aside the deed as to Frank Mechalek, save by such declarations, then the deed should not be set aside, and *vice versa;* but, where there is sufficient competent evidence to set aside the deed as to each of the grantees, we see no justice in refusing to give such relief, although some of the evidence admissible as to one may not be admissible as to the other.

Authorities are cited on each side with reference to whether his commitment to the hospital for the insane by the board of insane commissioners made a *prima facie* case of insanity, so as to throw the burden of proof upon the defendant to overcome the presumption that such condition continued down to the time of the execution of the deed, but we have preferred to consider the evidence under the assumption that it was for plaintiff to establish want of mental capacity, without regard to the commitment.

We have disposed of the controlling issues in the case, and reach the conclusion that the deed from Michael Chess to the defendant was executed at a time when he had not sufficient mental capacity to reasonably comprehend the nature and effect of his act, and that it should therefore be held void. The case is remanded to the lower court for further proceedings in accordance with this view.—REVERSED.