NANCY W. JAMES, Appellant, v. MAE L. FAIRALL, Executrix et al., Appellees.

**Wills:** EVIDENCE: DECLARATIONS OF BENEFICIARY: ADMISSIBILITY. The declarations of a devisee so connected with the making of a will in point of time as to be a part of the *res gestae* are admissible in the contest of the will for fraud or undue influence; and though not a part of the *res gestae* are admissible against the declarant when the sole devisee. But where there are several devisees whose interests are several and not joint the declarations and admissions of one are not admissible, because prejudicial to the other devisees.

**Wills:** FRAUD AND UNDUE INFLUENCE: EVIDENCE. Where the evidence
2  is such that reasonable minds may reasonably differ, the issue
should be submitted to the jury; and on appeal from a directed
verdict the appellate court will give the evidence the most favor-
able construction it will bear in support of appellant's claim. In this
case the evidence is held to require a submission of the question
of whether the execution of the will involved was induced by
fraud or undue influence.

*Appeal from Johnson District Court.*—Hon. R. P. How-
ell, Judge.

THURSDAY, FEBRUARY 15, 1912.

THIS is an action to set aside the probate of the will
of Ellen J. Fairall, deceased, and to declare the said will
null and void. A jury was called, and at the conclusion
of the testimony the trial court directed a verdict for the
defendants. Plaintiff appeals.—*Reversed.*

*Remley & Calkins,* for appellant.

*O. A. Byington* and *Wade, Dutcher & Davis,* for ap-
pellees.

DEEMER, J.—What purported to be the last will and
testament of Ellen J. Fairall, deceased, with a codicil at-
tached, was duly admitted to probate by the district court
of Johnson county, Iowa, on June 1, 1907, and Mae L.
Fairall was appointed executrix thereof. This action was
commenced by plaintiff, a daughter of the deceased, Febru-
ary 5, 1910, to set aside the probate thereof, and to declare
the said will null and void because of the fraud and un-
due influence of S. W., Harry, Maud, and Frank Fairall,
beneficiaries under the will. The parties last above named
answered, denying the alleged fraud and undue influence
and two other heirs, to wit, W. W. and Geo. W. Fairall,
filed an answer averring want of interest in the controversy

and offering no objection to the prayer of the petition. The case came on for trial to a jury and plaintiff, among other things, sought to show certain declarations made by Maud Fairall, one of the beneficiaries under the will after the execution thereof with reference to how the testatrix came to make it. These so-called declarations are said to have been made both before and after testatrix's death, and after the execution of the will. The will was made October 31, 1905, and a codicil was executed December 15th of the same year. By the terms thereof the principal beneficiaries thereunder aside from testatrix's husband, now dead, are the defendants S. W., W. W., Geo. W., Harry, Frank, and Maud Fairall. The will expressly provided that: "It is my will and wish and I so provide, that my daughter, Nancy W. James, shall have and receive nothing from my estate, except that I desire that she be paid any just claim or obligation existing between us."

I.   None of the declarations sought to be shown were part of the *res gestae,* and the question presented here is whether or not the declarations of one of the beneficiaries

1. WILLS: evidence: declarations of beneficiary: admissibility.

under a will showing or tending to show testator's incapacity or inability to make a will or that he was unduly influenced in making it are admissible in a suit to which all the beneficiaries are parties. Upon this proposition, there is a decided conflict in the authorities, and some distinctions have been made to which reference is necessary that our holding may not be misunderstood. Of course, if the declarations are so connected with the making of the will in point of time and circumstance as to give color thereto, they are admissible as part of the *res gestae.*

Again, if the declarant be the sole beneficiary under the will, his admissions are binding as against interest; and it is also a general rule in those jurisdictions which permit the probate of separate parts of a will that declarations of one of the beneficiaries tending to show undue influence

are admissible. Again, some courts hold that statements of one devisee are admissible in evidence to affect the interest of his codevisees where such interest is joint. See, as sustaining these views, *Potter's Will*, 161 N. Y. 84, (55 N. E. 387); *Higginbotham v. Higginbotham*, 106 Ala. 314, (17 South. 516); *Ames' Will*, 51 Iowa, 596; *Garland v. Smith*, 127 Mo. 583, (28 S. W. 196, 29 S. W. 836); *Capper v. Capper*, 172 Mass. 262, (52 N. E. 98); *Smith v. Henline*, 174 Ill. 184, (51 N. E. 227); *Morris v. Stokes*, 21 Ga. 552. But in those jurisdictions where the will is treated as a unit the declarations of a devisee are not admissible in cases where undue influence is charged; there being several whose interests are separate. *Livingston's Appeal*, 63 Conn. 68, (26 Atl. 470); *McMillan v. McDill*, 110 Ill. 47; *Shailer v. Bumstead*, 99 Mass. 112; *Dale's Appeal*, 57 Conn. 127, (17 Atl. 757); *Thompson v. Thompson*, 13 Ohio St. 356.

The overwhelming weight of authority in this country is to the effect that, where there are several devisees or legatees whose interests are several and not joint, the declarations and admissions of one of these are not admissible because they would operate to the prejudice of the other devisees. See cases already cited, and the following of our own which adhere to the same rule: *In re Ames*, 51 Iowa, 596, *Dye v. Young*, 55 Iowa, 433; *Parsons v. Parsons*, 66 Iowa, 754; *Goldthorp's Estate*, 94 Iowa, 336; *Hertrich v. Hertrich*, 114 Iowa, 643; *Hull v. Hull*, 117 Iowa, 738; *Fothergill v. Fothergill*, 129 Iowa, 93; *Vannest v. Murphy*, 135 Iowa, 126; *Chaslavka v. Mechalek*, 124 Iowa, 69, relied upon by appellant, does not announce a contrary doctrine. *Lundy v. Lundy*, 118 Iowa, 445, also relied upon, is readily distinguishable for the reason that the decision is planted squarely upon the ground that declarant was the principal beneficiary under the will, the recipient of substantially the entire estate, and the sole proponent. The will now before us makes a specific devise or bequest to W.

W. Fairall and devises the remainder to five of his other children, share and share alike. There was no joint gift, and the case does not fall within any of the exceptions heretofore noted.

II.    The only other question in the case is the sufficiency of the testimony to take the case to a jury. The verdict was directed at the close of plaintiff's testimony, and

2. WILLS: fraud and undue influence: evidence.

no evidence was offered for defendants. We are not to determine the very truth of the matter; on the contrary, we must give to the testimony the most favorable aspect it will bear in support of plaintiff's claim of fraud and undue influence, and, if rational minds might fairly reach the conclusion from this testimony that the will was the result of either fraud or undue influence, then the question is for a jury. We should indeed put it stronger than this, and say that, if reasonable minds might reasonably differ in their conclusions, then the question is for a jury. *Degelau v. Wright,* 114 Iowa, 52; *Hartman v. Railroad Co.,* 132 Iowa, 582.

The facts disclosed by the record, while not strong, were in our opinion sufficient in the absence of all explanation or counter showing to take the case to a jury. The terms of the will have already been set out, and it substantially disinherits the plaintiff. This, of course, is a circumstance which in itself proves nothing. But it may be considered with the other testimony in support or confirmation thereof. S. W., Harry, Frank, and Maud Fairall always lived with the mother, the testatrix, and were living with her at the time of her death; their home being what was known as the old Fairall homestead. Testatrix died in April, 1907, at the age of seventy-one years. Her health had been failing for some six or seven years before she died, and she was weak and nervous. Geo. W. Fairall had married some years prior to the death of his mother, and his family relations were not harmonious. Plaintiff, Mrs. James, a daughter, had also been married many years

and lived in her own home. W. W. Fairall, another son, is also married, and has not since lived with his mother. Down until some time during the latter part of the year 1904, the family relations were harmonious, and the mother seemingly thought much of her children and was not discriminating in her affections. At or about that time, George W. was having some trouble with his wife, and plaintiff was requested to go to S. W. Fairall's office to get some money to give George's wife that she might go to her parents' home in Mapleton. Mrs. James got the money and gave it to the wife. Testatrix learned that some one had furnished the wife with the money, and she became much incensed over the affair. She accused S. W. with having furnished the money, but he denied it, and led the mother to believe that plaintiff had furnished it. This so provoked the mother that she never afterward visited the plaintiff, and she finally reached such a point that she would not speak to her. Even after this transaction the mother said, however, that while she did not think plaintiff had treated her right, she did not intend to cut out any of her children by will, and that they should all have equal shares. She also declared at another time that she would not make a will; that she had promised her husband not to.

We now quote some of the testimony from the record.

One witness testified to hearing the following conversation between the testatrix and her daughter Maud: "Maud said to mother that, by God, if she did not make a will cutting Nan, meaning Mrs. James, out, she would leave home. Mother said she did not think Nannie had treated her right, but that she had always said she would never make a will cutting any of her children out; that they should have equal shares. Mother was nervous at this time, and she cried."

Another witness, a daughter of W. W., gave the following testimony:

In January, 1906, I spent several days with my Grand-

mother Fairall. At that time I had a conversation with her in reference to Maud inducing her to make a will. Q. Now, you may tell the jury what was said by your Grandmother Fairall in regard to Maud asking her to make a will? A. Well, Maud had gone to town after supper, and we were in grandmother's room, and grandma was nervous and upset; said she was living alone; that no one stayed with her, and her words were, a peculiar word she used, 'harangue;' that Maudie had harangued after her until she made this will cutting Aunt Nan out, and even then they were not good to her; that Maudie did not treat her nicely, and quarreled at her because she had to spend her time in town buying things for Geo. Fairall's children and things of that sort. Grandma talked quite a while, a good deal in the same strain, because she was upset about it. It was discussed frequently. Q. What, if anything, was said with reference to her not wanting to make a will? A. Why she simply said they had harangued at her; Maud had harangued at her until she made the will, still she was not treated nicely. I think, further, she went ahead and said her life was a hell, she wished she were dead. She cried the evening I refer to. She was nervous and cried as she talked. I have heard my grandmother make these statements several times, that she wouldn't make a will, because she had promised Willie, meaning my father, that she wouldn't. Grandmother Fairall told me that Maudie told her that Mrs. James did not speak to her when she passed her on the street. Grandmother's eyesight was very poor. This was some time after I was married in 1903, and was back here on a visit. Grandmother Fairall never said anything to me about having noticed it herself that Mrs. James did not speak to her. She felt badly about it, and said she had always been good to Aunt Nan, and could not see why she would be treated that way. Q. This time in January, 1906, what was said about the way in which she should make the will, if anything? A. I had a conversation with Maud Fairall at my home in Kansas City with reference to Maud having procured grandmother to make a will. Grandmother Fairall told me that Maud or some of the other children told her that Mrs. James thought more of her aunt, Mrs. Fickey, than she did of her own mother. The members of the family at grandmother's home included Maud, Harry,

Frank, and Sam W. Fairall.   Q.   Do you know of any
occasion when your grandmother went out when one of
these four children were not with her?   A.   No; she went
with some of them always.   I have heard Maud and her
mother talk about Mrs. James, but I can't state the times.
I heard them discussing Aunt Nan furnishing Geo. Fair-
all's wife money to go away on, and they were talking about
Aunt Nan then, and Maud said Aunt Nan had furnished
the money for George's wife to go to Mapleton, and Grand-
ma Fairall said her impression was that Aunt Nan was
causing the trouble between George Fairall and his wife,
and making trouble for grandma.   At that time Maud told
me in the presence of her mother that the money had been
furnished by Mrs. James, and she blamed Mrs. James and
Florence, George's wife, for making this trouble for George,
and grandmother told how sorry she was for him, and how
badly she felt that he had this trouble.   At this time we
were discussing my going to see Aunt Nan.   Maud would
not go with me there, because they said Aunt Nan had
furnished the money for this trip to Mapleton, and caused
the trouble for grandma.   Nothing was said as to how
grandma knew or learned that this money had been fur-
nished by Mrs. James.   Q.   You may state what your
grandmother said, if anything, in regard to the reason why
there was ill feeling towards Mrs. James?   A.   Because
Mrs. James furnished this money for Florence Fairall to
go to Mapleton, and caused trouble for her and George.
Q.   Was anything said by your grandmother or by Maud
in her presence about if you visited the Jameses, whether
or not you could visit them?   A.   Yes; Maud told me, if
I went to see Mrs. James, I could not come back to the
house and see my grandparents.   It was the practice during
the last four or five years during grandmother's life when
she came to town for some one to be always with her.   Grand-
mother Fairall died in April, 1907.   I have heard grand-
mother say she did not know what she had done to Mrs.
James to be treated as she was.   She had always treated
Mrs. James as a daughter.

W. W. Fairall further testified:

Q.   Now, you may state whether, prior to the time
when you heard Maud tell your mother she would leave

home unless she made a will cutting Mrs. James out, whether Maud had any conversation with you in regard to that? A. Yes, sir. Q. State that conversation. A. Maud came to me once at home when I was up there, and wanted me to go to mother and get her to make a will cutting Nan out. She says: 'If you go tell her to do it, she will do so.' Q. Did she say anything else at that time in connection with it; did she say what she would do unless the will was made? A. She said if mother didn't make that will, and cut Nan out, she would leave home. This was in the year 1905, before the will was made.

Plaintiff, after testifying to the incident of furnishing the money to George Fairall's wife, gave the following:

I saw S. W. Fairall the day following. Q. What did he say, if anything, in reference to his mother accusing you of furnishing the money? A. After the money had been given her and she had gone, Sam came to our place of business, and told me that his mother asked him when she found out the night before that George's wife had gone to Mapleton. She said to S. W. Fairall: 'Did your father furnish that money for Florence to go to her mother's at Mapleton?' Sam said he didn't. Sam told me: 'Mother said did you furnish the money.' Sam said: 'I didn't, I didn't have the money to give her.' 'Well, then, Nan must have given her that money,' and he said nothing. I said: 'Sam, did you lead my mother to believe I furnished that money for Florence to go away?' And his answer to me was: 'I lost one fortune by meddling with one old lady's affairs in Pennsylvania, and I don't propose to lose out with my mother.' I was at my mother's house when she was sick on her deathbed. None of these defendants and none of the family treated me with any kindness at that time, except my father. Q. When you would speak to her when she was driving would she respond? A. She did for a while. After a while she got so she didn't speak. When she didn't speak friendly to me at first, she would bow occasionally. Toward the last she got so she didn't speak at all or bow or recognize me at all. None of the family ever invited me out to the old home after January, 1904. Geo. Fairall sent his wife in for me on the Saturday before my mother died. Q.

Had there, prior to the time you were accused of furnishing money to George's wife to go to Mapleton in January, 1904, ever been any disagreement between you 'and your mother? A. No, sir; never. . . . I learned of my mother's sickness through strangers around town; and then, when I had been told by them that she was sick, I saw her physician and usually called at his office every day to inquire about my mother, and the doctor told me, when he thought my mother was going to die, he would tell me. Neither George nor Sam, nor Harry nor Maud, nor Frank ever came to visit me after 1904.

The testimony which we have noted was received without objection, and we have considered it without reference to any objection which might have been imposed under the rule announced in the first division or upon other tenable grounds.

We are constrained to hold that this testimony, while not strong, was enough to take the case to the jury, and that the trial court was in error in directing a verdict. It is suggestive not only of undue influence, but of fraud as well, and, in the absence of explanation, made out a prima facie case. Fraud and undue influence can rarely be established by direct proof. As a rule no one knows what influences are used to accomplish such ends. At best, the case must depend largely upon circumstances.

Such proof as there is here is more direct than is usually found in such cases, and, while the witnesses are more or less directly interested in the outcome of the suit, their credibility and the weight of their testimony was for the jury.

For the error in directing a verdict, the judgment must be, and it is, *reversed*.