IN RE ESTATE OF VIOLA A. COE.

ROYCE W. COE et al., Appellants, v. ESTATE OF VIOLA A. COE et al., Appellees.

No. 46394.

JULY 28, 1944.

1114

Woolsey, Stickney & Lucas, of Galesburg, Illinois, and McCoid & McCoid, of Mount Pleasant, for appellants.

Harold F. McLeran and F. S. Finley, both of Mount Pleasant, for appellees.

Bliss, J.—██ Both the challenge to the probate of the will and codicil and the supporting and opposing testimony are of a type very familiar to the courts. The propositions of law involved for the most part have been before this court many times. Whether the maker of a testamentary disposition of property had sufficient mental capacity, and whether the disposition was the desired and voluntary act of the maker or that of someone else unduly influencing or effecting the act are usually determined by the facts. This case is no exception. The facts are the determining factors.

Viola Coe was seventy-nine years old when she executed the will on August 12, 1939, and the codicil on the 27th day of the next month. She had never married and had spent her life as the housekeeper of her bachelor brother, S. N. Coe, who died January 21, 1939, at the age of approximately eighty-one years. By his will, made in 1924, he gave all of his property—an estate of about $25,000— absolutely to his sister, Viola. They were born at a crossroads settlement in Illinois, known as French Grove Corners, where their parents operated the grocery store and post office. There were four other children. The eldest, Anna, who married a Hardenburgh and moved away into Iowa, or other state to the west, had three children, and they are the proponents, Alora H. Dunn, Bertha Lewis, and Edna Bell. Another child, James E. Coe, married a neighbor girl, Harriet E. Wyckoff, and they lived on a forty-acre farm near by, which the wife inherited, until their deaths. This branch of the family is represented by their only child, Royce W. Coe, the most active contestant. Another child, Jennie, married Reed, and the other proponents are their children or grandchildren. The youngest child of the old folks at the Corners, was Laura,

who married a McRill. They moved to Kansas and never kept in very close touch with the other brothers and sisters and their families. The other contestants are the sons and daughter of Laura McRill.

Viola and S. N. Coe stayed with the parents. Viola helped about the home and store and worked in the neighborhood and her brother, S. N., operated a farm near by. In 1892 they both came to Henry County, Iowa, where S. N. bought a farm near Mount Pleasant, which he and his sister operated until about 1914 or 1915, when he bought a home in Mount Pleasant, which they moved into and occupied until their deaths. Some years after they came to Iowa their parents came and lived with them until the mother died in 1903 and the father in 1911. Their bodies were taken to French Corners for burial. S. N. and his sister went back to French Corners occasionally for visits and to attend funerals and for other purposes. They sometimes stayed at the James E. Coe home, and the latter and his wife and their son, Royce, and his children occasionally visited the Mount Pleasant home of S. N. and Viola. There appears to have been no particular friction between any members of the various branches of the family. Members of the Reed family visited at the Mount Pleasant home, and there were visits back and forth between the Alora Dunn family at Fairfield, Iowa, and Viola and S. N. The latter was a capable and thrifty business man. Both were active in church work. Viola taught a class in Sunday school for some years. After retiring from the farm they spent several winters in California. Viola was a bright, pleasant, companionable woman, neat in dress and clean in person. During her brother's life she had no occasion to attend to business matters.

The contestants introduced testimony that in 1936 she was struck by an automobile in Mount Pleasant, and that this was the inception of a mental decline which became quite precipitate after her brother's death in January 1939. This testimony, if it is true, tends to prove that she became more forgetful of persons and events, halting in her speech, careless of her appearance, untidy and unclean in her dress and person, and indifferent to matters going on about her. Much of this testimony covers a period a year and two years after the execution

of the will and codicil. There is undisputed testimony that in the spring or early summer of 1941, Miss Coe, before daylight one morning, slipped out of her home, without the knowledge of the maid, in her night clothes, and was found wandering confusedly about the streets and in the city park of Mount Pleasant, and it was with some difficulty that she was returned to her home. Some months later she fell in her home and injured her arm. She died January 21, 1942, at the age of eighty years and five months. Two local doctors, in response to long hypothetical questions, not always in keeping with the testimony and including some matters of little importance, gave opinions against her mental capacity. Dr. Soucek, superintendent of the state hospital at Mount Pleasant, in answer to a hypothetical question, testified that it indicated the subject ''was showing some signs of mental derangement—insanity,'' but did not confine his answer to any particular time or date. On cross-examination he frankly and freely stated that several of the hypotheses in the question were not evidential of insanity.

For the proponents, lay witnesses gave testimony directly contradictory to that of the lay witnesses of the contestants. Dr. Sternberg, who was the doctor whom Miss Coe and her brother called when in need of a doctor's attention, and who gave her a physical examination the day she executed the will, testified that he considered her of sound mind on that day. While we have briefly referred to this testimony as to the mentality of the testatrix for its bearing on the issue of undue influence, it is our judgment that the trial court rightly submitted the issue of testamentary incapacity to the jury.

I. Contestants urge that the most important error committed by the trial court was the withdrawal of the issue of undue influence from the consideration of the jury. We will set out, in substance, testimony bearing upon this issue.

The objections of contestants allege that the will and codicil were not the acts of Miss Coe, but were the expression and will of Alora H. Dunn, and the result of duress and undue influence exercised by her over the testatrix. Alora H. Dunn, a niece of the testatrix, is the wife of Irving H. Dunn, of Fairfield, Iowa. She is a lady of some business experience and the owner of property. On the morning of the day when he was

taken to the hospital just preceding his death, S. N. Coe told his sister to be sure to get Mrs. Dunn to come down from Fairfield. She came that afternoon and took Mr. Coe to the hospital. After his funeral, and within two or three weeks, she returned to the Coe home and gave personal attention to much of the business affairs of Miss Coe. She spent some time each week with her. A. M. Van Allen, lawyer at Mount Pleasant, had drawn the will of S. N. Coe and it was in his custody. It named Viola A. Coe as executrix. Mr. Van Allen notified her of the will and she came to his office and told him that because of her feeble health she thought best to decline the appointment of executrix, and asked that an old friend, James T. Gillis, be appointed. She signed and swore to such a declination and request on January 31, 1939, ten days after her brother's death. On February 15, 1939, Miss Coe and Mrs. Dunn came to the Van Allen office and Mrs. Dunn said that Miss Coe had determined to serve as executrix. On that day Miss Coe signed and swore to a withdrawal of her declination to serve, and on February 28, 1939, she was appointed executrix of her brother's estate. On March 22, 1939, she signed and swore to the inventory prepared by Mr. Van Allen, listing three pieces of real estate estimated to be worth $10,200, and fourteen items of cash and personalty valued at $11,151.07, and expenses of last sickness and burial of $855.30. She signed and swore to the final report on August 14, 1940, before Harold McLeran, and the estate was closed and she was discharged as executrix on November 26, 1940. The final report was prepared in the Van Allen office. She also signed all other papers required of her as executrix. George O. Van Allen, of the law firm, testified that when Miss Coe and Mrs. Dunn were in the office at the time Miss Coe signed the withdrawal of her declination to serve as executrix, "Miss Coe was apparently acting on Mrs. Dunn's directions," and "after the first time she came to the office, following her brother's death, Mrs. Dunn was always along and in charge thereafter," and "in the latter part of the administration, the instructions to our office came from Mr. McLeran." He also testified:

"Until Mrs. Dunn appeared on the scene, Mr. Gillis was the man she wanted to look after her business, because she had

confidence in him, but after Mrs. Dunn appeared, that didn't work because Mrs. Dunn didn't want him to act. Miss Coe did not do any of the work of Executrix. Mrs. Dunn did it. Of course Miss Coe signed the papers, but Mrs. Dunn did the business. Miss Coe didn't have any idea about it. * * * We never got any orders from Miss Coe in this estate. We got no explanation or satisfaction from Miss Coe herself. I am not sore at all because Mrs. Dunn took a hand in this estate instead of allowing Miss Coe to look after it herself. It was Miss Coe's suggestion that Mr. Gillis act—that wasn't our suggestion at all. We were allowed and paid the regular statutory fee [$325] for our services in the S. N. Coe estate, although it was objected to by Mrs. Dunn.''

Both the Van Allens testified that Miss Coe objected to the doctor's charge of $264 for S. N. Coe's last illness, and to the inheritance tax of $1,032.84, because she said she could not afford it and would have nothing left to live on. When George Van Allen called at her home to see about the payment of the doctor's bill, he testified that she told him ''she would have to wait until she saw Mrs. Dunn.'' Later Miss Coe consulted Mr. McLeran about the doctor's bill and he advised her to pay it, according to his testimony. There is nothing in the record showing that any executrix' fee was charged against the estate by Miss Coe or by Mrs. Dunn. The senior Van Allen testified that Miss Coe told him that a relative of hers had told her that Mr. Gillis was a very undesirable party and that she herself should assume the burden of the estate, and that she (Miss Coe) seemed very much set against Mr. Gillis. He testified that he could neither get Miss Coe to come to his office nor could he reach her by telephone; that the hired girl ''would * * * inform me that I would have to wait until Mrs. Dunn came down before the matter could be attended to. That happened on several occasions, in the spring or summer of 1939. I finally entirely gave up attempting to contact Miss Coe, after Mrs. Dunn took over, and thereafter I was in touch with the estate only through Mr. McLeran, who had been retained by Mrs. Dunn as her attorney. * * * In the latter part of the administration, I could never get past Mrs. Dunn, nor in touch with Miss Coe.'' A witness testified that Mrs. Dunn said she ''never had any use

for the Van Allens.'' Mr. Van Allen, senior, testified: ''Yes I was kind of feather-edged toward Mrs. Dunn and I didn't care to have any conversation with her and I was just as peeved as I could be toward her.'' On cross-examination, when asked if he had not expressed a wish 'that Mrs. Dunn be beaten in this law-suit, he answered: ''I am not clear, what I said, but it wouldn't grieve me if she lost the case.'' Mr. McLeran testified: ''I was advised by the Van Allens and by Miss Coe and by Mrs. Dunn that there was some disagreement between the parties and I tried to act as a go-between in order to enable them to finish up the estate.''

Mr. and Mrs. Miner, neighbors of the Coes, who took Miss Coe to church regularly after Mr. Coe's death, until she quit going sometime before her death, testified that Miss Coe told them that Mrs. Dunn had told her to sign no papers unless she was with her. Mr. Miner testified that she had asked his advice in some matters after her brother's death, and a little later she said to him:

'' 'I am not going to bother you any more about the business, because my niece from Fairfield is going to take charge of things.' She said that the niece from Fairfield told her posi-tively to do nothing in regard to anything until she was there. She said 'I have never made a will and I am afraid of it.' I know it was less than three weeks after Mr. Coe's death that Miss Coe told me I was too old and said that the niece from Fairfield would take care of her business.''

A maid who stayed nights with Miss Coe just after her brother's death testified that Mr. Gillis had been at the house several times talking to Miss Coe. She testified:

''She [Miss Coe] said that she didn't sign anything that he had over there that day. * * * Then Mrs. Dunn came on Tues-day, following that, and Mrs. Dunn said to me 'The way Miss Coe carries on about me, Mollie—she cries so much all the time—she doesn't know what she is signing or anything!' And I said, 'If it were me, I wouldn't let Mr. Gillis come in here all the time. She will be signing something, some of these days, that you will be sorry for.' And Mrs. Dunn said 'I know she will.' * * * At times, in 1939, when Mrs. Dunn was there, she had

difficulty in getting Miss Coe to do what she wanted her to. That happened more than once. Mrs. Laura Shawver was there, a niece from Abingdon, while I was staying there in 1939, and · she could do more with Miss Coe than anyone else could. Mrs. Shawver and Mrs. Dunn didn't get along very well. * * * When Mrs. Shawver was there, Mrs. Dunn was kind of an outcast. * * * The reason I told Mrs. Dunn that she ought to keep Mr. Gillis out of there was because Miss Coe would cry and feel bad and couldn't sleep at night and would worry after Mr. Gillis was over there. Miss Coe complained to me that Mr. Gillis wanted her to sign papers and she said she didn't know what they were. She cried after Mr. Gillis left, quite a few times.''

Mr. Gillis denied that he asked Miss Coe to sign any paper. The record shows that he had an option contract with S. N. Coe, under which, on the payment of $2,500, Mr. Coe would convey a residence property to him. This contract was in force at Mr. Coe's death. Mr. Gillis proposed to Mr. McLeran that he pay $500 and take a deed and give a mortgage back. Mr. Mc-Leran insisted on a payment of $1,000. On August 9, 1939, Miss Coe signed the deed in McLeran's office, and the next day Mr. and Mrs. Gillis. executed a note and mortgage for $1,500. Mr. Gillis testified that Miss Coe was of sound mind.

Mr. McLeran testified that sometime in July 1939 Miss Coe came to his office and said she wanted to draw her will; that she did not wish to remember Royce Coe and some others, and was not sure of their exact names; McLeran asked her to write to Mrs. Dunn for the names of the relatives, and later Miss Coe and Mrs. Dunn came to the office together; later, by correspondence, some of the names were procured, and McLeran was called to the Coe home; Mrs. Dunn was there; Miss Coe discussed her relatives and said she did not wish to leave anything to the McRills because she had been out of touch with them for years; McLeran suggested that each living child of Laura McRill, the deceased sister of Miss Coe, be given $25 to avoid any legal complications, and Miss Coe acquiesced; she stated that some money had been loaned to James and Hattie. Coe which had never been repaid and that she still held the note and mortgage; she decided to give the son and only heir of James and Hattie a credit of

$500 on the note and the unpaid interest, which took care of the James Coe branch of the family.

Among the assets of S. N. Coe which passed to the testatrix was a promissory note for $3,000, dated September 1, 1930, payable to S. N. Coe in five years, with interest at six per cent per annum, bearing the names of J. E. Coe and Hattie E. Coe as makers. Payment of one year's interest was endorsed on the back. With the note was an agreement between S. N. Coe and Harriet E. Coe that, to secure the debt of the latter to S. N. Coe, the debtor and her husband, James E. Coe, deeded a described thirty-six acres in Peoria County, Illinois, which land was to be reconveyed to Harriet E. Coe on payment of the debt. This agreement bears date of June 29, 1931, and the names of S. N. Coe and James E. Coe. No such deed was found in the safe-deposit box of S. N. Coe. Jennie Coe, the wife of the contestant Royce W. Coe, testified that at the funeral of James E. Coe in 1933, she overheard but took no part in a conversation between S. N. Coe and Harriet E. Coe and Viola A. Coe. Her testimony is as follows:

"Then Uncle Newtie [S. N. Coe] came in and said that he forgot to bring along that $3,000.00 note that Father Coe [James E. Coe] had made him take. He said it was to be canceled if he didn't demand it while he and father were alive, and he said he would destroy it. And Mother Coe [Harriet E. Coe] said 'All right, Newtie' and Aunt Ola [Viola A. Coe] said she wanted it destroyed too."

The note was not destroyed. The contestant Royce Coe and his son Howard testified that the name of Hattie E. Coe on the note was not her signature.

According to Mr. McLeran's testimony, Miss Coe, after directing that $100 be given to her niece, May Reed, in trust for Dorothy Reed, daughter of Charles Reed, ordered that the property remaining, after paying debts and expenses of funeral, last sickness, and of administration, should be divided into two equal parts, one of which should go equally to the three Hardenburgh children, Alora Dunn, Bertha Lewis, and Edna Bell, and the other part should go equally in four shares to the Reed heirs,

Ethel Bowers, May Reed, Laura Shawver, and to Harley Reed's children.

The will was prepared as directed, by Mr. McLeran, and he and his secretary then went to the Coe home. Miss Coe was there and also Mrs. Dunn, and Dr. Sternberg, whom Mr. McLeran had called to examine Miss Coe as to her mentality. The will was there read to Miss Coe. She declared it to be her will and it was duly signed by her and three witnesses.

On September 27, 1939, Miss Coe and Mrs. Dunn came to the McLeran office and the codicil was prepared canceling the bequest in the fourth paragraph of the will to Royce W. Coe, and giving him instead the $3,000 note of his father. This note was of no value. No claim therefor had been filed against the estate of either James or Harriet E. Coe.

Shortly after S. N. Coe's death, Royce W. Coe and his son Howard, about thirty-five years old, called upon Miss Coe. Several more calls were made upon her by them in the next few months. They inquired about how her brother had disposed of his property, and how she was getting along with it, and offered to look after it. They inquired for an attorney and were directed to Mr. McLeran and he took them to the courthouse and they read the will. Howard and Miss Coe went to the bank and the contents of S. N. Coe's safe-deposit box were examined. While Royce Coe was usually present, the son testified to all of the conversations and transactions with Miss Coe. Each time they called he said they found Aunt Ola worse mentally. He testified that she said her mind did not work right any more; she could not remember; she seemed cheerful ''until we started asking how she was getting along with Uncle Newtie's property. We wanted to know how he left her and if he left all of it to her but she said she didn't know. She said she thought there was a will but she didn't know that * * * she wanted him [Mr. Gillis] to be administrator. She said she wasn't able herself; that she wasn't capable of doing any business because she was very forgetful * * * but that Alora wouldn't allow him to be.'' The matters just related took place on the second Saturday after Mr. Coe's death and before the will had been probated. The third visit was on a Saturday a little later. Howard testified that she told them about the $3,000 note, of which neither his

father nor himself had ever heard, and that the state was trying to tax her on it, and that we need not worry about it, as her brother and James had fixed it up long ago. Of the fourth time he and his father were out, he testified:

"She said Alora Dunn was handling the business. She said 'I am not going to make any will. I don't need a will. I just want it to go as Uncle Newtie wanted it to go. * * * I don't need a will.' She had no inclination for a will then."

On May 9, 1939, she mailed Howard a post card that she was going to Abingdon, Illinois. He testified that about the second Saturday after that he and his father again came to Mount Pleasant:

"We had not seen anything of her on her Illinois trip. * * * I asked her how she got along on her trip. She said all right she guessed. We were talking and Aunt Ola said 'Well they want me to have a will. They want me to make a will.' And my father said, 'Who are they?' [An objection prevented the answer she made.] Well after that question was answered she said she didn't need a will and that she didn't have any use for one."

Howard and his father made their seventh trip in the latter part of July 1939. Howard said she was much worse physically and mentally then. It was Saturday and she thought it was Sunday. They were next out to see her on a Saturday in the latter part of August 1939. Howard testified:

"There was hardly anything you could talk about to her * * *. Her mind was no good at all any more. We didn't say anything about business at all. She was so bad she didn't remember much of anything. I went out there again in September * * *. I was alone that time. She seemed to be a little better but not much better. Finally she said, 'Well we made a will. It suits us. It don't make any difference whether it suits the rest of you or not.' I said, 'Well, who are we? What do you mean by we?' She said, 'Alora Dunn and Laura Shawver and I.' Then I said 'That is a kind of funny way to make a will. I thought you were supposed to make the will.' 'Well,' she said, 'we did; it suits us.' "

Howard also testified that Mr. McLeran told them that he would see that no one got Miss Coe's property and that he would look after her as much as he could, as that was one of his duties as county attorney to see about those things, and that later he told them he had drawn her will and "that everyone had been well remembered."

Mrs. Royce W. Coe, a witness for contestants, testified to many matters of much importance. When the funeral party was going from Mount Pleasant to French Corners, Laura Shawver and Bertha Lewis rode in the back seat of the Royce Coe car, driven by him. His wife sat with him. She testified:

"I heard Laura Shawver say to Bertha Lewis, 'If Alora and I hadn't gotten the will made, we would have had to put Aunt Ola in the asylum.' She said that Aunt Ola was very hard to handle."

Laura Shawver denied this. Bertha Lewis did not testify. Mrs. Dunn gave no testimony bearing upon the issue of undue influence. The estate of the testatrix had a value of $30,000 or more.

It fairly appears that Mrs. Dunn attended to the business affairs of Miss Coe, in large part. She looked after the farm and the other property. While Miss Coe signed various receipts for money, and some checks, they were usually written by Mrs. Dunn. On December 16, 1939, Mr. McLeran prepared and Miss Coe executed a power of attorney to Mrs. Dunn giving her quite general authority to manage the property and business of Miss Coe.

On August 5, 1941, Mr. McLeran prepared and Miss Coe signed a petition asking the court to appoint Mrs. Dunn as the guardian of her person and property. It recited that she was of sound mind, but because of her age and physical infirmities she was handicapped in taking care of her business affairs, and that Mrs. Dunn, who had been assisting her in these matters, was well qualified. Judge Newell, after talking with Miss Coe, made the appointment and Mrs. Dunn qualified.

█ It is our conclusion that under the record the issue of undue influence should have been submitted to the jury. Some of the witnesses, notably the contestant Royce W. Coe, his wife, and son, were interested in the outcome of the action, and

this interest bears upon their credibility and the probative value of their testimony. The will as made gives to Mrs. Dunn and her sisters and to Mrs. Shawver and her sisters more than they would receive as heirs of Viola Coe. All of these matters are for the consideration of the jury, and this court is in no way intimating any conclusion thereon. As said in James v. Fairall, 154 Iowa 253, 257, 134 N. W. 608, 609, 38 L. R. A., N. S., 731, in reversing a ruling withdrawing the issue of undue influence from the jury:

"We are not to determine the very truth of the matter; on the contrary, we must give to the testimony the most favorable aspect it will bear in support of plaintiff's claim of fraud and undue influence, and, if rational minds might fairly reach the conclusion from this testimony that the will was the result of either fraud or undue influence, then the question is for a jury. We should indeed put it stronger than this, and say that, if reasonable minds might reasonably differ in their conclusions, then the question is for a jury."

The controlling principles of law applicable to the issue are well recognized and have many times been stated and discussed by this court. Further review of them would serve no purpose. We have recently applied them in a number of cases. See the following decisions and the authorities cited therein: In re Estate of Hollis, 234 Iowa 761, 12 N. W. 2d 576, 581; In re Estate of Heller, 233 Iowa 1356, 11 N. W. 2d 586, 591; In re Estate of Brooks, 229 Iowa 485, 493, 294 N. W. 735; Shaw v. Duro, 234 Iowa 778, 14 N. W. 2d 241, 246.

Because of our conclusion on this issue we find it unnecessary and of little benefit to pass upon numerous other assignments of error in appellants' unduly long argument of two hundred seventy-five pages.

The judgment is—Reversed.

MANTZ, C. J., and MILLER, OLIVER, GARFIELD, WENNERSTRUM, MULRONEY, and SMITH, JJ., concur.