## IN RE WILL OF SUSAN BUSICK.

### HENRY BUSICK et al., Appellants, v. JAMES BUSICK et al., Appellees.

**WILLS: Undue Influence—Declarations of Legatee.** Declarations by
1   legatees who are practically sole beneficiaries under the will, made
in the presence of each other, and before or after the execution of
the will, tending to show their domineering and dictatorial control
over testator, are admissible on the issue of undue influence.

**WILLS: Undue Influence—Jury Question.** Evidence of brutal and
2   domineering conduct toward a testatrix reviewed, and held to pre-
sent a jury question on the issue of undue influence.

*Appeal from Wright District Court.*—G. D. THOMPSON, Judge.

### MAY 10, 1921.

THIS is a will contest. Trial to a jury, which found for
contestants. The motion for new trial by proponents was over-
ruled, and they appeal.—*Affirmed.*

*Berry & Hill* and *Healy, Thomas & Healy,* for appellants.

*Senneff, Bliss, Witwer & Senneff* and *Birdsall, McGrath &
Archerd,* for appellees.

PRESTON, J.—The contestants waived proof as to the execu-
tion of the will, and it was offered in evidence by proponents.
At the conclusion of the contestants' evidence, and again at the
close of all the evidence, the proponents moved for a directed
verdict in their favor, which was overruled. The objections to
the probate of the will were that deceased did not have sufficient
mental capacity, and that the will was procured by undue in-
fluence. The evidence showed lack of business experience and
some mental deficiencies, lack of education, physical condition,
and so on, and perhaps some evidence of mental incapacity; but
the court held that there was not sufficient evidence of mental in-

capacity to take the case to the jury, and withdrew that issue, but submitted the case to the jury on the question of undue influence. Appellees have not appealed from the refusal of the court to submit the issue of the alleged mental incapacity. The will was executed in April, 1895. The signature thereto by testatrix was by making her mark. She died in October, 1917, at the age of 81 years. The will gives to her three sons James, William, and Perry, and to the three daughters, Rose Harnden, Eva Wiegand, and Abbie, each the sum of $5.00, and then gives to the proponents, Henry and Oliver, all the remainder of her personal property, of whatever nature or kind, also all her real estate in Wright County, Iowa, and all her interest in real estate in Indiana left by her father, lately deceased. Testatrix was a widow, her husband having died in 1890. She was the mother of 11 children. At the time of her death, she had 5 sons and 3 daughters living, and several grandchildren. At that time, two of her sons were inmates of the insane hospital. At the time of the death of the husband, in 1890, the children were all adults, and had gone from home, except the two proponents, who were at that time under age, and two daughters. One of the daughters was married, the year following her father's death, and moved to Missouri soon after. The other daughter was married in 1900. The sons Henry and Oliver, proponents, remained at home. The son Perry remained at home for 3 or 4 years after the father's death. Perry was not of strong mind, and gradually grew worse, until he was finally committed to the hospital at Cherokee. The contestants are some of the children and grandchildren. At the time of the execution of the will, there were at home with the mother the three sons Henry, Oliver, and Perry, and the daughter Abbie. Henry was then 23, Oliver 21, and Abbie 16. Perry left the home a few years after his father died, and worked in the neighborhood about a year, and then returned to the home place, and remained until sent to the asylum, a year or so before this trial. When the husband of testatrix died, he was the owner of 220 acres of land, 60 acres of which were set apart to the widow in 1891. She also received 55 acres of land in Indiana, which was sold about 1902. The widow was paid $700 for a year's support, and the exempt personal property was set off to her, part of which proponent

Henry claims to have bought of his mother; and he also says he sold the cattle and hogs. Proponents purchased some of the shares of the other children in the land set off to them. Testatrix lived on the 60 acres until her death, and proponents lived with her, except that Henry was married, 3 or 4 years ago, and after that did not live in the same house; but they still continued to work the same farm. With some assistance from Perry, they carried on the farm, and the two proponents also farmed their own land. Proponents used the farming implements set off to the widow as exempt, in carrying on their own land and the 60 acres in question. Only a part of the 60 acres was farmed, about 15 acres at first. Some of it was wet, and about 15 acres wood land. Appellees claim, and it appears to be the fact, that Henry was the dominating force on the premises, directing his mother and the others what to do, and supervising and managing the farm, while the field work was done more largely by Oliver and Perry. For a time after the death of their father, the three sons used the real estate under some arrangement by which they were to pay one third as rent. Perry received no compensation for his services thereafter, except board and clothing. He filed a claim against the estate therefor. The entire management of the farm was by proponents, and they sold the live stock and farm produce. The mother sold the butter and eggs, and purchased groceries therewith for the family. After the 60 acres were set off, proponents never paid any rent therefor, up to the time of her death. They received the crops, and the only consideration they gave was the payment of taxes. Proponents purchased the shares of four of the heirs, shortly before the execution of the will. The shares of Perry and Abbie were purchased in 1898. In January, 1909, testatrix executed a warranty deed to proponents for an undivided one third of the 60 acres in controversy, the deed reciting that the consideration was $1,500, and that possession was not to be given until her death. At this time, testatrix was ill, and in such condition that her attending physician thought she was likely to die at any time. The deed was brought down to testatrix by the banker with whom proponents did business, and where testatrix also checked out a small amount in a year. Apparently, proponents thought this deed conveyed the entire 60 acres. Henry testified that he and

his brother now owned the 60 acres that were set off to the
mother, and that, in a way, they purchased the 60 acres. Ap-
pellants also purchased the shares of some of the grandchildren,
though not all. At her death, deceased owned two thirds of the
60 acres and a time deposit of about $700 in the bank, substan-
tially all of which was what was left of the $1,100 she had re-
ceived from her father's estate and placed in the bank about 20
years before. William, now in the insane hospital, and contest-
ant James instituted proceedings for the appointment of a
guardian for their mother, which was refused. This was shortly
before the will was made. About this time, testatrix spoke
to the administrator of her husband's estate about deeding her
interest in the property to Henry and Oliver, the proponents;
and he advised her to make a will, if she wanted to do anything
for the boys. When the will was drawn, testatrix went to the
office of an attorney alone, and instructed him how to draw the
will. No one else was present. Witnesses were called in, and the
will was read over in their presence. After it was executed, it
was placed by testatrix in the bank, where it remained until her
death. Contestants James, Eva, and Abbie say they did not
know of the will until after her death; and it is claimed by
appellants in argument that there is no evidence to show that
proponents knew of the will until after her death; but we do
not find that they so testify. Appellees contend, however, that
they did know about it, and that they, by threats, intimidations,
and undue influence, procured the making of the will. Ap-
pellees say that there is a taint of insanity in the family since
the elder son, Elwood, shot himself at the house of one of the
neighbors, for some undisclosed reason; and that the two sons
William and Perry are insane. It appears that testatrix was a
simple-minded, kindly disposed, hard-working old lady. The
evidence shows that she was a woman without schooling or edu-
cation, and appellees contend that by nature she was below the
average in mental capacity; that she could not read or write;
that she could read but little, and that with difficulty; that her
reading consisted in trying to spell out a few passages in the
Bible; that she never read newspapers; that she could not readily
count money. On the other hand, it is contended by appellants
that, for several years after her husband's death, she attended

to her own business in a prudent manner; that she took the butter and eggs to the store, and did the shopping for the family. This is the general situation, which we have attempted to state without going too much into details.

Appellees contend that proponents, and especially the son Henry, began a course of the most brutal treatment of their mother; that this began within a year after their father's death; and that it was continued, both before and after the execution of the will, up to the time of her death; and that thereby she was influenced in making the will she did. This seems to be the principal ground relied upon by appellants, as to whether the evidence was sufficient to take the case to the jury on that proposition. We shall not attempt to recite all the testimony. If the evidence offered by contestants is sufficient for that purpose, then, though denied by proponents, the conflict in the evidence was for the jury, and their finding is conclusive upon us.

Perhaps we should take up one or two matters complained of by appellants and assigned as error, in regard to the admissibility of certain of the testimony; so that, if admissible, such testimony may be considered with the other evidence.

1. Contestant James Busick testifies, over objection by proponents that it was incompetent, irrelevant, and immaterial, 1. WILLS: undue influence: declarations of legatee. to a transaction and conversation between witness and his brother Perry, on one side, and proponents, Henry and Oliver, on the other, in 1894, as follows:

"Well, I went down there with my brother to get the hay which he claimed belonged to him. When I drove in, they asked me what I was after. I says, 'I came down with my brother to get his hay;' and they says, 'Get off the place;' and I says, 'I don't have to get off the place, this is mother's place, and I will come here when I want to.' I says, 'I am not molesting you boys;' and they says, 'If you don't get off, we will take a club and drive you off;' and they tried it. They both tried it, both Henry and Oliver. Perry didn't get his hay at that time."

This was shortly before the execution of the will. He also testifies to a conversation some time after the execution of the will, in the fall of 1907, when he says that proponents, Henry

and Oliver, were cutting off all of their mother's timber. He says:

"I went down where they was. They were logging this timber, and I says, 'Brothers, what are you doing here, cutting off mother's timber?' and they says it was none of my God damn business what they were doing; and I says, 'Why, brothers, this isn't mother's wishes;' and they says: 'It don't make any difference. Mother don't get her wishes. We get our wishes.' Well, I says, 'It is mother's property,' and I says, 'You better not go on;' and they says it didn't make any difference what I said; and they says, 'We fixed this long ago, long ago.' They says: 'We fixed this long ago, and mother didn't have much to say about it. She didn't get her wishes. We got ours, and you will not get anything out of her, nor the rest of them.' I says, 'You fixed it?' and they says, 'Yes, God damn you, we fixed it, and if you don't get off the place we'll put you off.' That is what my brothers, my two brothers, right there said."

The objection to this question and the motion to exclude were on the ground that it was incompetent, irrelevant, immaterial, not bearing on any question involved; too remote, having been several years subsequent to the execution of the will. James says also that he started no quarrel, and that he was not up there on any other occasion when he had any trouble, and that this was the only time they undertook to drive him off, although he wasn't up there thereafter for a long time. Proponents' version of this transaction is somewhat different. Henry states that he got off the wagon and stopped James, and that then a fight began, and so on. We have held in several cases that evidence of admissions or declarations by one or a part of the parties interested is not binding upon others. But we held in *Lundy v. Lundy*, 118 Iowa 445,—and the rule has been recognized in later cases,—that there is a well-defined exception to the rule, where proponent is, by the will, made the recipient of substantially the entire estate, and he is before the court, asserting soundness of mind, and he is charged by contestants with exerting undue influence. See, also, *James v. Fairall*, 154 Iowa 253, reported and annotated in 38 L. R. A. (N. S.) 731.

In *Beyer v. Schlenker*, 150 Mo. App. 671 (131 S. W. 465), it was held that such evidence was admissible, whether made

before or after the probate of the will, or whether before or after its execution. In the instant case, Henry and Oliver are the sole proponents, and the only ones interested in sustaining the will, since they received the entire estate, except six bequests of $5.00 each. The conversation related was by them together, and apparently acting together. The evidence was, we think, competent, so far as the point just suggested is concerned. Possibly the objection is not broad enough to cover that. The real objection, we take it from the argument—and this is in connection with the objection to the instructions given—is that it does not relate to the execution of the will, and has no bearing on the issue of the alleged undue influence. But undue influence may be proved circumstantially; indeed, it is seldom capable of other proof. We think the jury had a right to consider this evidence, in connection with all the other circumstances in the case, and to interpret it as referring to the execution of the will, and as bearing upon their attitude toward their mother in reference to her property, and as admissions by proponents that the testatrix was not permitted to do as she wished with her property. There is other evidence, both before and after the execution of the will, and extending over a long period of time, which the jury could properly consider in connection with this testimony.

Instructions 7 and 8 are complained of. By Instruction 7, the jury were told, substantially, that:

"Direct evidence of undue influence in procuring the execution of a will is not required, to prove the existence of such undue influence. Proof of undue influence may be made by evidence of facts from the inference of the existence of such undue influence may naturally and reasonably be drawn. And if you believe from the evidence, by a preponderance thereof, that any fact or facts are proved from which the inference may be fairly and reasonably drawn that the alleged will of Susan Busick, now deceased, was procured by undue influence operating upon her at the time of the execution of said will, then, and in that case, it is your duty to find that the said alleged will is not the will of the said Susan Busick, deceased."

The objection to the instruction is that there was no evidence, or not sufficient evidence, of undue influence to take the case to the jury. We are of opinion that there was sufficient evi-

dence, and further testimony will be referred to later in the opin-
ion.   Another objection to this instruction is that the second
sentence is obscure.  It is, somewhat.  It is apparent that a word
or two has been inadvertently omitted; but the meaning is plain,
and there is nothing that could mislead the jury.

By Instruction 8, the jury were told as to matters which they
might take into consideration in determining the question as to
whether there was or not undue influence operating upon testa-
trix at the time the will was executed: among them her intelli-
gence or lack of it; her mental weakness or strength; her will
power; the terms of the will itself, whether just or unjust, rea-
sonable or unreasonable, natural or unnatural, and so on; or ''any
evidence of admissions or declarations on the part of the pro-
ponents or either of them, tending to show that the execution
of said will was the result of the exercise of undue influence * * *
and any and all other facts in evidence bearing upon said mat-
ter.''

The objection to this instruction is that it refers to the
evidence of Henry and Oliver before set out, and that such evi-
dence does not refer to the execution of the will.  We have al-
ready stated our views in regard to this, and we think there was
no error in either instruction.

2.   The testimony for contestants tends to show that pro-
ponents, and more particularly Henry, mistreated their mother,
both before and after the execution of the will.  This treatment
consisted in the use of vile and profane lan-
guage toward her, and a constantly domineering
attitude toward her; also, physical violence.
Abbie, the daughter of testatrix, testifies at length as to the
treatment of the mother by proponents during the time from
1894 until she was married, in 1900, and during her visits sub-
sequently.  She is not named as a contestant.  She says that
Henry gave orders to all of them and to his mother; that Henry
called his mother names, and struck her with his fist; called her
a dirty, filthy, old bitch and whore; called her a God damned old
bitch; that she heard him use that language sometimes every
day in the week; wouldn't say it was every week, but there never
was a week in which there wasn't a time when language of that
kind was used, both before and after the execution of the will,

2. WILLS: undue
   influence: jury
   question.

when she was there; saw Henry strike her with a chair; slam her to the floor; slap her and knock her against the wall; knock her down with his fists and kick her, and hurt her so that she had to go to the doctor; that this conduct was almost continuous; that the mother would plead with him not to strike her; that he would tell her to do as he told her, and mind him; that witness interceded, and got the same treatment as the mother; that he showed no affection for his mother in the presence of witness. During these times, the mother manifested fear of him.

"Q. You may state in what way she showed that fear. A. She wouldn't talk when she would see him coming; when she would see him coming, she would say to me, 'Now, Abbie, keep still.' Q. Before he came in, what would be her conduct,— would she be talking? A. Why, certainly. Q. But when he came in, she would immediately quit talking? A. Yes, sir."

One day, witness saw her mother with her head bandaged, and asked her in the presence of Henry what was the matter; and the mother, crying, told her that Henry had struck her; and at that time, Henry made no denial, but left the house. She thinks that was about 12 years before the trial. Dr. Meyer says of this transaction that testatrix told him that Henry had hit her with a belt buckle; that the wound was on the left side of her head, a cut 3 or 4 inches long, through the scalp to the bone; that he took 3 or 4 stitches; that he thinks Henry was present when he treated her. The doctor says further that, for a woman of her age, he would think she was below par in respect to her mental capacity; not the same as an ordinary person of that age. He thinks he treated her in about 1909. Henry, testifying as a witness, and some of the others perhaps, say that there were no stitches, and that the wound was slight. Henry admits that he did it, but says that it was an accident; that a buckle on his coat struck her, when he was putting it on. Abbie continues:

"Heard mother ask Henry and Oliver for rent for her property. Henry would tell her to go to hell, and get it if she could. He would tell her, 'You don't know where the property is; you don't know where it has gone; you don't know what you've done.' He would call her names, and she would cry. Henry abused Perry; saw him strike him with his fist. The room where he slept was filthy."

She continues:

''Before the will was drawn, I heard Henry say that I was hanging around there for the property. Mother said I was not. She said, 'She is just as good as you are, and it is her home.' I heard a conversation between mother and Henry, before the will was executed, in which she said that the children would all be treated alike. He says, 'You don't know what you have done, you old fool; you don't know what you have done. You don't know anything about it.' Oliver was married in the spring of 1900. I left in the fall of the same year, after his wife came to the home. After his wife came, mother did the housework for years. Mother had her own bedroom. After Oliver was married, he brought his wife home to live. I told Oliver of my mother's wishes in regard to bringing his wife there. He says, 'It is none of her business. I will bring her here.' And he did. I did my mother's washing during the years after father's death when I was home. When I was not at home, she did it. Mother was a nice, clean housekeeper during the years that she had her strength. Q. During the later years of her life, tell the jury the condition of the room that she lived in there at this home. (Objected to for the reason that it is confined to the latter part of her life, which is 22 years following the execution of the will. Objection overruled. Proponents except.) A. It was dirty and fithy, and it was fit for no human being to live in. It was never cleaned. Mother was not strong enough to clean it herself. The carpet was falling to pieces with dirt and filth, and the bed clothes were the same. I was there during mother's last illness. She had no care. Her clothes were patches, and she had on a little nightgown that only came around her waist. There were no sheets on the bed. She asked me to bathe her. Before I bathed her, she was not clean. She was lying in her own filth and the discharges of her own body. Her back was solid sores. She had few clothes during the time I was there. Sister Rose died in 1907, and was buried 5 or 6 miles from mother's home. Mother was not at the funeral. I was at home a half dozen times in the last years. I knew what was taking place, but I couldn't stop him. My sister wrote to me, and wanted me to come. After I returned from

Missouri, it was the same kind of treatment as it was when I left home. I would have given her a good home and good care.''

She gives other similar testimony, going into details. The daughter Eva testifies to some of the transactions, but not so much in detail. She testifies to a matter before the will was drawn, between Henry and testatrix: That Henry took one of the two horses set off to her and sold it, and made his mother give him $50 more to put with it, to buy another horse; that she asked him for the money, and said it was her horse that he sold; that he cursed her until he made her give up the money. She helped care for her mother during her last sickness. The bedding was anything but clean. While she lived near enough, she visited her mother 5 or 6 times a year. Dr. Meyer and Mrs. Coburn testify that testatrix told them that Henry had taken $800 or $900 from her, and she wondered whether she would ever get it back. Mrs. James Busick testifies that testatrix told her that the boys had taken all her money and property, and that they forced her to do it, or they would have killed her; that she wanted all the children to share equally, but that she had no control over it. There is testimony that, when testatrix was invited to the homes of her other children, she would tell them that she dare not do so, as the boys would not allow her to go, and when asked why she stayed there and took the abuse, she said: ''This is my home, and live or die, I will never leave it.'' There is more of like testimony. Some of it is denied by proponents, and some of it is qualified and explained.

It is said by appellants that testatrix expressed satisfaction with the terms of her will, 21 years after it was executed. The evidence to sustain this claim is:

''She told me in regard to a will that she had and a little of the family trouble she had been having; said she had made a will, and that Henry and Oliver would get the bulk of her property; that her son Jim would not get any of it, if she could help it.''

At the time the will was drawn, the daughter Abbie was living at home, a girl of 16 years of age. She was given $5.00, and there is no good reason apparent why the property should have all been given to proponents. The inequalities in the will are not conclusive, of course, but they are circumstances, with

others, proper to be considered. Proponents were, it is true, not present at the precise time the will was drawn. It was not necessary that they should have been present if, at the time, she was acting under their influence. It is true, too, that testatrix made no change in her will during the 22 years after its execution, and before her death. The treatment of her by proponents was calculated to prevent her from making any change. We think that contestants, by their evidence, made a case for the jury, and that the jury could have well found therefrom, as they did, that, at the very time of the execution of the will, testatrix was acting under the undue influence of the proponents. Proponents' evidence in contradiction thereof makes no more than a conflict.

The judgment is—*Affirmed*.

Evans, C. J., Stevens and De Graff, JJ., concur.

Weaver, J. (dissenting.) I dissent. In my opinion, the contest of the will is wholly without merit, and should have been dismissed on the court's own motion.