CHARLES ALBERT WALTERS, JR., Appellee, v. DAISY MAY HEATON et al., Appellants.

No. 43260.

FEBRUARY 9, 1937.

REHEARING DENIED OCTOBER 1, 1937.

De Vere Watson, for appellants.

John J. Hess and J. A. Williams, for appellee.

SAGER, J.—The opinion in this case was originally prepared by Albert, J., and we adopt it substantially as written, except for a modification of the statement of facts claimed by plaintiff-appellee.

On the 5th day of February, 1927, Rose Walters made a deed of certain property in the city of Council Bluffs, to her daughter, Daisy May Heaton; and on the same date Rose made a will, the substance of which was to give to a son (Jerry by name) $10, and all the balance of her property to her daughter Daisy May. Rose died on the 28th day of April, 1933, and in May of that year this will was duly admitted to probate and the estate

administered. On the 13th day of December, 1934, the present action was instituted to cancel the deed and to set aside the probate of the will. This action was based on the grounds that Rose was mentally incompetent at the time of the making of said will and deed, and that the will and deed were the result of undue influence exercised over the said Rose by the daughter Daisy May. On the 22d of January, 1935, the plaintiff filed an amended and substituted petition, and on the 28th day of January following, the defendants filed their duly verified answer. The case was assigned for trial on the 19th of March following. On the 25th day of April the defendants filed an application for permission to withdraw the answer for the purpose of filing a motion, and on the same day filed a motion to separate the causes of action and transfer to the law docket, and also a demand for a jury trial. The motion to transfer was overruled, and the request for a jury trial was refused. Following this, on the first of May, the trial was commenced.

█ █ █    The real error complained of is the ruling of the court refusing the applicants permission to withdraw the answer for the purpose of filing a motion to transfer to law. The correctness of this ruling is determined by reading sections 10963 and 10964 of the Code, as follows:

"10963.  * * * The court, at any time before the answer is filed, upon motion of the defendant, shall strike out of the petition any cause or causes of action improperly joined with others.

"10964.  * * * All objections to the misjoinder of causes of action shall be waived, unless made as provided in section 10963."

As shown by the record in this case, the defendants filed their answer and afterward sought to withdraw it for the purpose of filing a motion to transfer. The two sections of the statute above quoted are wholly decisive of this matter. The instant that the defendants filed their answer section 10964 went into operation, and their right to raise the question of misjoinder of causes, or to transfer to the law docket, is, by said section, "waived"; and having once been waived, it is waived for all time. This statute means exactly what it says, as we have many times held. See Woodworth v. Ry. Co., 170 Iowa 697, 149 N. W. 522; Benjamin v. Petersen Co., 170 Iowa 461, 153 N. W. 71;

Overstreet v. New Nonpareil Co., 184 Iowa 485, 167 N. W. 669; McDonald v. Second National Bank, 106 Iowa 517, 76 N. W. 1011; Keller v. Strong, 104 Iowa 585, 73 N. W. 1071; Gray Bros. v. Otto, 178 Iowa 854, 160 N. W. 293. A reading of these cases will show that this court has never varied from the exact wording of this statute.

But the defendants insist that the court erred in refusing the application to withdraw the answer. We think that the court's refusal to permit the withdrawal of the answer in this case was right. Even though we should hold that the matter was discretionary with the court, we do not think the court abused its discretion. The relation of these two instruments (the will and the deed) is such (having been made on the same day and at the same time) that it necessarily follows that, if there was lack of mental capacity sufficient to avoid the will, or that it was the product of undue influence, both must fall. The question of the sufficiency of the evidence to set aside a will or a deed on the ground of undue influence has been fully disposed of by this court. In the case of Hann v. Hann, 202 Iowa 807, 809, 211 N. W. 495, 496, we reviewed this question and, quoting from In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114, we stated the fundamental rule as follows:

" 'Influence, to be undue, within the meaning of the law, must be such as subjects the will of the testator to that of the person exercising the influence, and makes the written will express the purpose of such person, rather than that of the testator. It is frequently said that it must be equivalent to moral coercion, and directly connected with the execution of the will, operating at the time it is made [citing Iowa cases]. The person charged with exercising undue influence need not have been personally present when the will was made, but his influence must have been actively operative [citing cases]. Undue influence is not established by proof of opportunity to exercise it and a disposition to do so [citing cases]. Importunity, requests, and persuasion that do not go to the point of overthrowing the will of the testator, are not sufficient to constitute undue influence [citing cases].' "

With this rule in mind we have scanned this record with care, and find that the plaintiff has failed to establish undue influence by a preponderance of the evidence.

There can be no controversy in this case over the due execution of the will, it having already been probated. In addition, due execution is duly proven; and due execution is presumed until the contrary is shown. Smith v. Ryan, 136 Iowa 335, 112 N. W. 8.

The question left in the case is the question of the mental capacity of Rose Walters at the time these instruments were made. It is settled in this state that in an action of this kind the burden is on the plaintiff to prove the lack of mental capacity. See Convey v. Murphy, 146 Iowa 154, 124 N. W. 1073.

■■■ In cases of this kind, sanity is presumed, and the burden is on the plaintiff to overcome this presumption. See Waters v. Waters, 201 Iowa 586, 207 N. W. 598; Kerkhoff v. Monkemeier, 188 Iowa 103, 175 N. W. 762; Philpott v. Jones, 164 Iowa 730, 146 N. W. 859.

In the case of Firestine v. Atkinson, 206 Iowa 151, 153, 218 N. W. 293, 294, we laid down the general rule as to mental capacity required for testamentary disposition of property, quoting from Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55:

" 'His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity.' "

In the same case we discussed the question of insane delusions.

Evidence of monomania (partial insanity) is admissible, but will invalidate a testamentary disposition only when shown to affect its provisions. 68 Corpus Juris, p. 432.

In the case of Albright v. Moeckly, 202 Iowa 565, loc. cit. 569, 210 N. W. 813, 814, we said:

"Ability to transact business generally is not essential to testamentary capacity. Advanced age, failure of memory, senile dementia not shown to render the testatrix of insufficient mental capacity to understand the nature of the act, to recollect the extent of her property and the natural objects of her bounty

and their claims upon her, and to comprehend the manner in which she wishes her property distributed, childishness, mental weakness, old age, are not of themselves sufficient to deprive her of testamentary capacity. * * * It is significant that no witness, expert or lay, expresses the opinion that testatrix was of unsound mind at the time the will was made.''

Remembering that the burden of proof is on the plaintiff here to show lack of mental capacity, we are disposed to hold that he has not sufficiently sustained this burden.

The record herein made is very unsatisfactory. We are unable to determine from the record the age of the testatrix at the time the will was made. With the one exception of the physician introduced by the defendants there is no medical testimony. It is also significant that none of the witnesses offered by the plaintiff ventured to express the opinion that the testatrix was of unsound mind at the time the will was made. The record is also confusing in that the will and deed were executed on the 5th day of February, 1927, and both sides (in many cases over objection) have introduced testimony as to the acts and conduct of the testatrix up until the time of her death, which was in April 1933. In many instances it is difficult to determine whether or not the circumstances related by witnesses as to the acts and conduct of the testatrix occurred prior or subsequent to the execution of the deed and will.

Of course, we cannot review all the testimony in a contest of this kind. The plaintiff's case turns largely, if not wholly, upon the testimony of three neighbor women; but, before we give attention to this testimony it might be well to state briefly some of the background as shown by the evidence.

Charles D. and Rose Walters were husband and wife. Charles died on January 22, 1925. As we gather from the record, they had two children, Charles Albert Walters (known in the record as ''Jerry''), and Daisy May, who was married to one Heaton. At the time that this will and deed were made, the son Charles Albert was on his deathbed, with no hope of recovery. He, in fact, died the next day. The plaintiff here, Charles Albert Walters, Jr., is his son.

The crux of the whole case must turn upon the mental capacity of Rose Walters on the 5th day of February, 1927, the day on which these instruments were made.

We do not undertake to set out the testimony in detail.

The case presents the familiar picture of a will contest, with the conflict of testimony usually appearing in such cases.

Plaintiff's witnesses recount many instances in the life of Rose Walters, though the dates of their occurrence are not always clear.

Thus, Kate Grote says: "Rose would talk one way and then another"; that on the occasion of the death of the witness's husband, Rose stated to her, in effect, that the deceased would not have much of a funeral, because he was a common working man, while in the case of Mr. Walters it would be different, because he was a business man. She would complain that she was getting "pretty near crazy." She said Daisy (her daughter) "bothers me so, she doesn't want Jerry to have anything"; complained of broken bones in her foot when no such injury appeared; talked about her babies that had died, and spoke of having to go home and wait on them. She complained about having to pay for eggs purchased from the witness. She complained that she had to keep her cat penned up or someone would steal it, when the cat was not, in fact, penned up. She inquired several times a day whether she left her purse at the witness's house. She carried on a conversation with her own reflection in the glass. At times she walked about the house and picked buds when the buds were not in bloom. After her husband's death she was not neat nor well dressed. Her conversations jumped from one thing to another. On one occasion she said: "They are trying to keep me in here, but I am going to get out." She mistook the daughter of the witness for a music teacher. In her speech she would go from one thing to another, and the witness stated that she could not make out what she was talking about. She imagined she was being watched and that she wasn't allowed to do the things she wanted to do. She came to the home of the witness to inquire after her house key, when she had it with her; complained she was not allowed to run her own house, and inquired of witness whether she noticed tombstones with angels on them. In the language of the witness: "Her condition was like she was doped, wasn't right." She did not understand matters of business. She spoke of flowers that were not there, and on the occasion of her husband's death, "She was coming down the stairs, jabbering something, and Daisy (her daughter) would say, 'Don't pay any attention to her, she is crazy.'" She

dug up plants without roots and offered them to the witness for replanting. She asked the witness for a quarter, saying, "I can't get any money," when she had money in her pocketbook. On February 5, 1927, it was the judgment of the witness: "That she would have no understanding of business matters."

The witness further, on redirect examination, expressed the opinion that in her judgment there never was any time after her husband's death when Mrs. Walters was able to transact any business.

This witness testified to a number of other incidents of the same general nature.

The testimony of the plaintiff's witness Mary Wiese was of the same general nature. This witness said there was not much sense in her talk. She talked to herself practically all the time, and it was not intelligent. She would talk about being mistreated, and at such times would be in a stare, with a wild "starey" look. At times her daughter would say that the witness should pay no attention to her mother, that she was not right.

This witness further testified in considerable detail about a conversation had with appellant Mrs. Heaton, about her mother making a will, and that she (Mrs. Heaton) should have all the property of her mother; and with reference to a deed which her mother had made to her, but which deed was not to be recorded. Witness further talked with Mrs. Walters with reference to her property many times, saying there were two homes; the one in which Mrs. Heaton lived was to be hers, and the other her son's. After her son's death she said that the corner house was to go to appellee, Jerry, and her daughter, Mrs. Heaton, was to have the other. She made reference to a will in which everything had been left to Mrs. Heaton. After the death of her son Jerry her condition remained the same. That summer she would take leaves from a catalpa tree and plant them in front of the porch, saying she was going to grow vines on the porch. She talked about taking trips and packed her trunk; would go from one room to another and say she had just come from the hotel. She talked to herself in the mirror, and would get up in the night and cook eight or ten eggs. She spoke of having roomers upstairs.

This witness also testified that Mrs. Heaton was never nice to her mother, would curse her, and in later years would slap

her. She saw Mrs. Heaton strike her mother numerous times. She saw her force her mother to sign a book full of checks at one time. This was in 1929 or 1930. She (Mrs. Walters) was not capable, in the opinion of the witness, to understand matters concerning her property; her mind was so affected as not to understand business matters, and she had not the mental capacity to do it. The appellant Mrs. Heaton took charge of all her business, saying her mother was not capable to handle it; that she could not send her mother to an insane hospital because she couldn't have money; had to have her mother where she could get the checks. She would say witness should not pay any attention to her mother, that she didn't know what she was doing.

Much other testimony of the same general nature, from this witness, appears in the record. The credibility of her evidence is to be weighed in the light of the fact that the record shows that she has a lawsuit pending in the same court against the defendant Daisy May Heaton.

Caroline Dunham, daughter of Kate Grote, corroborates many of the details of Mrs. Grote's testimony, and adds little in substance thereto. She testifies that she does not think the testatrix was able to understand business matters or property rights of any kind.

Mrs. Gilbert Mueller, another witness for the plaintiff, testified she worked and took care of Mrs. Walters in 1930, and that then Mrs. Walters had a stroke of apoplexy. She testified to certain incidents of mistreatment by her daughter Daisy.

This is the substance of the testimony of the plaintiff.

To meet this the defendants introduced several witnesses, whose testimony will be summarized.

Mrs. Lizzie Enbody testified that she lived in the same block with Mrs. Walters for twenty-five years, and was intimately acquainted with her. The witness was district manager of the Security Benefit Association, of which Rose Walters was president in 1925 and 1926. They made a fifteen-day trip together in 1925. "She discussed the making of a will and deed with me, and asked me if I would come up the next day and be there. She (Rose) said that, of course, Jerry was in the hospital, and the doctors said absolutely he could not last. He died on the 6th day of February. She (Rose) told me that she felt when she got through with Jerry's bills that she had to pay, that is all that he should have. On the 5th of February, 1927, in the after-

noon, there was no one there in Mrs. Walters' room except Mr. Benjamin, Pearl M. Cook, Rose Walters and myself. We were there two hours. I talked with Rose before the will was signed, and afterwards. Mr. Benjamin took the will after it was signed, and also the deed. He offered it (the deed) to Mrs. Heaton, but she didn't want the responsibility, so he kept the deed also. They were tendered to Mrs. Heaton. Mrs. Walters was lying in bed at the time and raised up to sign the papers. The doctor was Dr. Augustine and the nurse was Pearl Atkinson. When I saw Rose on the 5th of February, 1927, she was the same person I had known for twenty years previous. I did not notice anything unusual in her manner of speech, or her physical appearance. There was no change after the death of her husband. There was no change in her personal habits. Her conversation was coherent, she talked just as she always did. She transacted business officially for the organization and she knew what she was doing and understood. She was at that time of sound mind.''

Pearl Atkinson, who acted as nurse during the sickness of Mrs. Walters in February 1927, saw nothing unusual about her manner of talk. ''She talked the same as on former occasions when I had talked with her. I saw Fremont Benjamin and a stenographer come to the house. The daughter Daisy was downstairs. With reference to Mrs. Walters' personal habits at that time, she looked like she came out of a bandbox. She recognized her acquaintances and relatives. Her mind seemed to be clear enough, I didn't see anything wrong with it. In my opinion she was of sound mind. Mrs. Heaton employed me to nurse, and Mrs. Walters paid me.''

Verne Benjamin, another witness for the defendants, testified that he is a lawyer and had known Rose Walters since 1900. ''I had occasion to see her and talk with her and deal with her on numerous occasions up to the time of her death. She was a woman that had a very strong mind of her own. I talked with her in her home the day of Jerry's funeral. I was never her lawyer but have seen her at the office many times. I saw her shortly before and after February 5th, 1927. I noticed nothing unusual or strange in her or her manner. The deed in controversy was in my father's possession and was in his safe when he died, in August 1927. I delivered the deed personally to

Daisy Heaton. I would say that she (Rose) was of sound mind on February 5th, 1927.''

Lucille Barritt, a witness for the defendants, testified:

''From 1920 to 1930 I lived catercornered from where Mrs. Walters lived.'' After describing her acquaintance, association, and frequent visits during these years, she testified that she saw no difference in the appearance or talk of Mrs. Walters. The witness said: ''I say she was of sound mind.''

Pearl M. Maylott, who was stenographer for Fremont Benjamin, and was present at the drawing of the will, and had a former acquaintance with Mrs. Walters, testified that when they went to Mrs. Walters' home: ''She wanted to make a will. She told Mr. Benjamin she wanted it made as tight as possible; she wanted him to make the will as tight as possible so it couldn't be broken, because she expected it would be contested.'' The testatrix told Mr. Benjamin as to what disposition she wanted made of the property. She did this without assistance or suggestion from anyone. ''Mr. Benjamin dictated the will to me and I put it in typewriting. Rose appeared to know exactly what she wanted and how to get it. She was very clear in her directions as to what she wanted. Mrs. Enbody and I acted as witnesses. The deed was drawn by me in response to the request of Mrs. Walters. She had made numerous visits to Mr. Benjamin's office by herself in the settlement of her husband's estate. When she came into the office she gave directions for certain business transactions to be done. I saw nothing unusual or different in her manner or actions or conversations at that time than I had previously. These instruments were executed exactly as she dictated and she signed them. I would say she was of sound mind at that date (February 5, 1927) as she ever had been in my acquaintance.''

J. E. Storm, another witness for the defendants, testified that he lived near the residence of Rose Walters for about twenty years and saw her once or twice every week, or once every week. ''I sold her tea and coffee. I discussed business matters with her at numerous times, up until the year 1927. I recall the time of Jerry's death. Aside from business transactions I would frequently see her around her place, when I would go back and forth. I passed there every day. Sometimes she paid me by check and sometimes by cash. The checks would be signed by Rose. Mrs. Heaton might make them out, but she

(Rose) would sign them. On February 5th, 1927, from my association and acquaintance with her, I did not see anything to indicate that she lacked the mental capacity to understand and transact business.''

As heretofore suggested, no one of the witnesses for the plaintiff presumed to testify that Rose was of unsound mind on the 5th day of February, 1927, whereas, on behalf of the defendants, six disinterested witnesses testified that the testatrix was of sound mind on the day the will and deed were made.

The doctor who attended Mrs. Walters during her sickness in February 1927, testified that for fifteen years he was a member of the board of insanity commissioners of Pottawattamie county, and was such member in 1927. He treated Mrs. Walters for a chest condition and bad cold. He saw her three times during that period. She was confined to her bed. There was nothing in her mental condition to attract his attention. He prescribed for her physical ailments. He made no particular examination or specific observation for the purpose of passing on her mental capacity. She told him that her son Jerry was sick in the hospital and that she had stayed all night, sitting by an open window, and developed a pain in her chest.

The presiding judge, in passing on this case, suggests a long acquaintance with the Walters family and that there is very strong testimony on both sides. After summarizing the claims of both parties, he makes comments as to certain parts of the evidence, and, to our minds, gives too much weight to the points made. It appears that in the trial of the case one of the attorneys tendered to a witness a certain number of checks which were not introduced in evidence. The court comments on this matter and seems to weigh it as an adverse circumstance against the defendants. When the record is checked it is found that these checks were all made in the year 1930, or three years after the time the will was made, so such circumstance cannot be considered of much, if any, weight in passing on the mental condition of the deceased. More than this, the defendant Daisy testified on the witness stand that she had written many checks for her mother.

Another matter that the court took into consideration, as related in its findings, is in reference to bills that Rose would have to pay for Jerry: ''We as lawyers know that Griffin Wheel Company employing more than three men carry work-

men's compensation insurance that guaranteed the payment of the bills of the last sickness and death of the deceased. So it is not a reasonable explanation." There is not a particle of evidence in the record showing where or under what circumstances Jerry was injured (if he was injured), or that he was working for the named company, or that the company employed more than three men or carried workmen's compensation insurance.

Adverse criticism is made of the testimony of Mr. Benjamin, which is wholly unwarranted. The only testimony in the case is that Verne Benjamin was not employed by Rose at any time as her attorney, and so long as the relation of attorney and client does not exist, the comments made by the court in its opinion have no application.

Viewing the case as a whole, under the rules of law we have heretofore recognized, we do not think the burden which the plaintiff assumed at the commencement of this case has been successfully sustained by him. Especially on the question of mental capacity, the weight of the testimony in the case, instead of being for the plaintiff is against him.

The matter having been tried in equity, the rules of equity will govern; and, the case being triable *de novo* here, the rule in a law action that where there is a conflict in the evidence the decision of the lower court must stand, does not apply.— Reversed.

ANDERSON, PARSONS, HAMILTON, and STIGER, JJ., concur.

RICHARDS, C. J., dissents.