Ida Campbell et al., Appellees, v. Henry O. Hale, Appellant; Herman O. Hale et al., Appellees.

No. 45804.

November 17, 1942.

Rehearing Denied April 9, 1943.

Thos. M. Healy and Alan Loth, both of Fort Dodge, and C. A. Smedal, of Ames, for appellant.

D. M. Kelleher, Dwight G. Rider, and Maurice J. Breen, all of Fort Dodge, for contestant appellees.

J. I. Dolliver, of Fort Dodge, for executor.

Sager, J.— One of the grounds upon which appellees sought to set aside the will was mental incompetence but the trial court withdrew that issue from the jury. The record abundantly justifies the ruling. The cause was submitted on the sole issue of undue influence.

Appellees thus describe testatrix:

"* * * Elizabeth Hale was always a long ways from being normal physically, but up until 1935 or 1936 she was active and able to be about most of the time, and during that period she was a strong-willed, shrewd business woman, very charitable and very religious, and she dominated the home. True, her appearance was almost unbelievable in view of her general background. Notwithstanding her appearance she was a fine character, good, fair, charitable, religious, and she had a good mind. Naturally, under the circumstances she thought a great deal of Henry. In fact, all of the love, affection and interest in life that Elizabeth had was pretty much centered in Henry and Herman. * * * she was far from attractive in appearance. She had an extremely large body and small limbs that were insufficient to support the enormous body causing her to walk very peculiarly. She had weak eyes and no teeth and spoke with a decided impediment."

With this description we agree except as it is limited to the years 1935 or 1936. As we read the record, this fits her condition as it was up to the latter end of 1937 or the early part of 1938, when her last illness began.

A painter who worked for the Hales from 1921 until 1937 gives this summary of the testatrix' condition:

"In the fall of 1937 Mrs. Hale showed me what she wanted. She arranged with me for doing the work. I took my orders from her. She paid me when I finished. As long as I have known the Hales, I took orders from her as to what to do. While I have seen her crying, she was generally a cheerful lady who was happy, and teased and joked with people. That was pretty much her usual disposition. When she wanted work done she usually got it done. I remember in connection with this interior decorating, Mr. Hale said he didn't care how long it took; for me to do it so long as I satisfied her."

The abstract and transcript before us are very long and it is manifestly impossible, as it is unnecessary, to do more than to touch upon the high lights of the testimony. The record is replete with minute details of the daily life of the testatrix. This comes largely from the family servants, who would convey

the impression that every act and every word that looked and sounded queer to them had its inception in some misconduct on the part of appellant. Appellees charge that appellant was cruel, domineering, and tyrannical and that he had his wife under such subjection that the will in controversy was his rather than hers. We have been unable to read the record to any such conclusion.

It is said by some of the witnesses that testatrix frequently expressed herself as wishing that she could do as she liked and wept over her disability to do so. If this testimony could have any purpose (except as to her mental state if that were in issue) it could only be to imply that appellant was to blame for this, rather than that it was due to her physical condition.

So, too, it is pointed out that she sold accumulations of flower pots, magazines, and other odds and ends, and solicited trifling funds for some charity; that she had no other funds and could get none, not even her own money (she had inherited hundreds of thousands of dollars from her parents)—this because she had no checkbook and could get her hands on none, all because of the actions of appellant. Her thrift in small matters might seem strange to those not familiar with her upbringing, but that her husband had anything to do with her actions in this regard does not appear. That she was not without a checkbook is abundantly sustained by this record. Not only does the spoken testimony bear this out but the many exhibits before us show that she signed checks: in 1935, 23; in 1936, 613; in 1937, 776; and in 1938, 14—a total of 1,426, representing withdrawals of approximately $40,000. Seven of these checks were joined in by her husband.

It is argued by appellees that appellant did not permit visitors to see his wife when she was sick. This may have happened in rare instances, in the case of one or two persons whom appellant did not like. The only other times that he gave orders that visitors be excluded were when testatrix was so sick that outsiders had no right to see her; but it is not claimed that he ever interfered with anyone who had any business with his wife, or that he attempted to dissuade or persuade anyone from coming who had the right to insist on seeing her. (We except

for the moment the foster son, Herman.) Least of all could it be claimed that he made any move to prevent his wife from consulting whom she would about her will.

Testatrix had talked with Williams, with whom she was acquainted and with whom she had dealt, before appellant knew anything about it; and it was only when Williams appeared at the house that the matter of the making of the will first came to his attention. To this we will return later.

That there is evidence in the record to show that appellant was sometimes lacking in thoughtfulness of the feelings of his wife may be admitted, but such treatment seems to have had no influence in the making of the will. This is manifest by the provision made for the foster son, Herman. Appellant held toward Herman what seems to have been an unreasonable dislike, to the extent of threatening to kill him. On the other hand, testatrix had conceived an affection for Herman which was extreme to the point of dotage and naturally she was distressed by appellant's attitude toward him. That there may have been some justification for his attitude may be seen in the facts that Herman did not finish school, would not hold a job, and started a suit to put his foster mother under guardianship. But whatever may be said of this particular relationship, it does not appear that appellant sought to cut off or reduce the provision which testatrix had made for Herman in a previous will. The only suggestion he made was that this devise and bequest be given to Herman outright rather than to be tied up in a trust. The will under investigation left him $30,000 in cash or securities and a large farm.

The arguments of the parties cover wide fields and discuss many questions which need have no attention here. Thus, much is said about so-called contracts by which testatrix and appellant each agreed to leave his or her property to the other at death. So, too, there is considerable said about joint and mutual wills, and the talk had with their legal adviser, the Honorable Seth Thomas, on this subject. We regard these matters as important only as they tend to show that the testatrix' purpose in 1933, so far as it related to appellant, was the same as at the time the will before us was executed, July 7, 1937. Both wills had the effect of leaving all her property to her husband, except for

a few bequests which may be considered minor in proportion to her whole estate. That he should have it all when she was gone was her expressed intention at all times when the subject came up. From this idea she never wavered. We find in the record no statement of hers to the effect that appellant was not to be substantially her sole legatee. She had conveyed one half of her inheritance to him and there is no question but that she wished him to have it all when she died. Upon what, then, rests the claim of undue influence urged by appellees?

As has been stated, Williams had talked with testatrix in the early part of July about making a will, and shortly thereafter she called him to her home and told him, in the presence of appellant, that she was going to make a will naming him executor with her husband, and Mr. Porter of Ogden as attorney for her estate. He expressed himself as being unable to prepare such a will and suggested that she employ Attorney Loth. She declared that she did not want Mr. Loth. It was then suggested by appellant that perhaps Thatcher, long-time friend and acquaintance, might draw the will.

On July 6, 1937, at the suggestion of Williams, Thatcher appeared at the Hale home and found testatrix and her husband present. The matter of making a will was then discussed. Thatcher agreed to act as executor. Several attempts to reach Attorney Rider by telephone were made without success. The old (1933) will was produced and read aloud by Thatcher. During this reading no suggestion was made by either until a certain trust provision in behalf of the foster children, Betty and Herman, was reached. Appellant said, ''Pencil that trust provision out; give it to them outright, it will never do them any good anyhow.'' Testatrix made no verbal comment and Thatcher noted on the will that it was to go out.

There was considerable discussion about the name and location of the cemetery in which testatrix' brother had been buried. Next, a small bequest to Mrs. Othiem was reached and Mrs. Hale directed that she should receive $100. There was no discussion between the husband and wife about that bequest, nor one of $100 to Doctor Leighton. Next testatrix suggested that Mr. Porter be named as attorney, as he had been in the other will. There was no discussion about that nor about

Thatcher's acting as executor. The section of the old will with respect to the provision for appellant husband was left intact, copied from the original will.

During the consideration of the devise and bequest to Herman of the farm and $30,000 there was some discussion as to whether it should be "cash" or "cash and securities." Testatrix directed that Herman should have the "U B farm and $30,000 cash." Testatrix further directed that Betty should have $5,000 in cash for a home, to which appellant said, "Yes, put in that the title to this home must at all times remain in her name."

There was in the old will some provision for the Baptist church and at the suggestion of appellant it was left out.

The old will with its notations was taken to Attorney Rider's office on July 6th and a draft, Exhibit 13, was prepared by him. This was taken back to the Hale home and read aloud by Thatcher. Again notations were made but no substantial changes were made. Exhibit 13 was returned to Mr. Rider's office and Exhibit 4 was prepared. This was taken to the Hale home on July 7th by Mr. Thatcher, who found testatrix and appellant sitting on the porch. Thatcher started to read the will when Williams drove up; thereupon appellant said, "Don't read any more of it, I don't want Walt to know what is in there." They went into the living room but the reading of Exhibit 4 was not continued. Testatrix picked up the will, glanced over the first page, but apparently did not turn to the others. Appellant said, "It is typed and ready the way you want it mother." She signed. Witnesses were called to attest its due execution. It appears that Exhibit 13, with the notations made thereon, was fully comprehended by Mrs. Hale; and since no claim is made that Exhibit 4 does not conform to the provisions of Exhibit 13 as modified by the notations thereon, it would seem that the failure to read the finished will, Exhibit 4, would be of no importance in determining whether Exhibit 4 was in fact Mrs. Hale's will.

Williams testified that testatrix said before signing, "That's not the way I want it but I will sign it anyway and change it later." This statement was not heard by Thatcher. Before sign-

ing, testatrix hesitated a bit and appellant said, "Mother, you don't need to sign this if you don't want to, but it is just as we said it was." The will as last seen by Thatcher was as it lay on the table.

As against the testimony just narrated (if it is against it) is that of Fern E. Johnson, a young woman who was employed in the home and who was lying sick in the adjoining room. Her testimony was that appellant said "no" to testatrix at the suggestion that she wanted to leave Herman two farms besides money; that Betty was to have a home; that a home was to be left to Doctor Leighton; and that she make provision for the Baptist and possibly the Methodist churches, and for Mrs. Othiem. As to leaving the churches anything, Thatcher testified:

"Henry's statement * * * applied to the whole church clause, and he added 'the money can be given to them direct.' "

There was no discussion about the residuary bequest to appellant. Mrs. Johnson was present likewise when the final draft of the will was brought in for signature. Her version of what transpired was this:

"Mrs. Hale did not take the paper in her hands and read it. * * * Mr. Hale told her she didn't really have to read it because she had just wrote it, that first morning. She asked for her glasses to read the will and he thought it wasn't necessary because it had just been written up as she had wrote it and knew what was in it."

It should be noted that appellant did not read the will, and, unless we have misconceived the import of the record, he could not have read it if he wanted to because about all he could do was to write his own name. It may be significant that Mrs. Hale made no effort to leave any of her property to appellees, who were collateral relatives with no claim upon her except kinship; in fact the name of none of them was mentioned at any time.

No one claims that appellant was present when the wills were being prepared by Mr. Rider. The record is also devoid of any showing that testatrix was not perfectly competent to

consult Mr. Rider or anyone else in private had she cared to, had she felt the will was not as she wanted it.

In this state of the record appellant moved for a directed verdict at the close of appellees' evidence and again at the close of all the testimony. The motion should have been sustained; and, when the matter came up again on the motion for new trial, that motion should have been overruled. That the trial court had some misgivings as to the propriety of its ruling on the motion for new trial is evidenced by this quotation from the ruling:

"All briefs have been carefully examined and re-examined, together with the authorities cited in them, and the court has reluctantly reached the conclusion after due consideration that the motion for new trial must be sustained * * *."

In holding that the trial court erred in sustaining the motion for new trial we are not unmindful of the frequent expressions appearing in our decisions that we are more reluctant to reverse a case when a new trial is granted than where it is denied. But, nevertheless, we have made it plain that where there is no evidence warranting the setting aside of a verdict it should be permitted to stand. As bearing on this question, see Bennett v. Ryan, 206 Iowa 1263, 222 N. W. 16; Copeland v. Junkin, 198 Iowa 530, 199 N. W. 363; Hart v. Stence, 219 Iowa 55, 257 N. W. 434, 97 A. L. R. 535; Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55; In re Estate of Mott, 200 Iowa 948, 205 N. W. 770; Parker v. Lambertz, 128 Iowa 496, 104 N. W. 452; Henderson v. Jackson, 138 Iowa 326, 111 N. W. 821, 26 L. R. A., N. S., 479; Brackey v. Brackey, 151 Iowa 99, 130 N. W. 370; Johnson v. Johnson, 134 Iowa 33, 111 N. W. 430.

None of the authorities cited by appellees support the ruling of the trial court either on the motion to direct or the motion for a new trial. Murphy v. Murphy, 23 Ky. L. R. 1460, 65 S. W. 165; Thomas v. Timonds, 179 Iowa 509, 159 N. W. 881; Hoover v. Hedrick, 178 Iowa 1235, 155 N. W. 851; Walters v. Heaton, 223 Iowa 405, 271 N. W. 310; Worth v. Pierson, 208 Iowa 353, 223 N. W. 752; In re Estate of Ramsdell, 215 Iowa 1374, 244 N. W. 744; Baker v. Syfritt, 147 Iowa 49, 125 N. W. 998; Stewart v. Todd, 190 Iowa 283, 173 N. W. 619, 180 N. W.

146, 20 A. L. R. 1272; Child v. Smith, 225 Iowa 1205, 282 N. W. 316; Campbell v. Dunkelberger, 172 Iowa 385, 153 N. W. 56.

Having held as we do, that the trial court should have directed a verdict for the appellant and should have overruled the motion for new trial, we are under no necessity of examining the other assignments of error. The cause is accordingly reversed with direction that judgment be entered on the verdict sustaining the will.

Appellant's motion to strike appellees' supplemental brief filed on September 24, 1942, is sustained.—Reversed and remanded with instructions.

WENNERSTRUM, C. J., and BLISS, HALE, MILLER, and STIGER, JJ., concur.

MITCHELL, J., takes no part.