IN RE ESTATE OF R. E. FARLOW.

RALPH R. FARLOW et al., contestant-appellees, v. BEULAH FARLOW, proponent-appellant.

No. 47890.

(Reported in 50 N.W.2d 561)

DECEMBER 13, 1951.

Reynolds, Meyers & Tan Creti, of Carroll, and R. E. Franck, of Denison, for proponent-appellant.

Page & Nash, of Denison, for contestant-appellees.

GARFIELD, J.—The sole question upon this appeal is whether there is substantial evidence testator's will was procured by undue influence of proponent-appellant, testator's widow. Contestants are the three living adult sons of testator's prior marriage. The will, made March 25, 1949, leaves $100 to each contestant and the rest of the estate to proponent. The jury found undue influence.

From judgment on the verdict denying probate proponent has appealed.

■ Of course the evidence must be viewed in the light most favorable to contestants, giving them the benefit of all permissible inferences. See In re Estate of Telsrow, 237 Iowa 672, 674, 22 N.W.2d 792, 794; James v. Fairall, 154 Iowa 253, 257, 134 N.W. 608, 609, 38 L. R. A., N. S., 731.

■ There is no direct evidence the will was the product of undue influence exercised at the time it was made. However, we have said many times undue influence may be, and usually is, proven by circumstantial evidence. Direct proof is seldom available. See In re Estate of Telsrow, supra, 237 Iowa 672, 677, 22 N.W.2d 792, 796, and citations; In re Estate of Ankeny, 238 Iowa 754, 760, 28 N.W.2d 414, 417; In re Estate of Rogers, 242 Iowa 627, 635, 47 N.W.2d 818, 823, and citations.

This is not a case where the claim of undue influence is strengthened by a showing of mental incapacity. There is no evidence testator was of unsound mind. There is testimony he was sorely troubled, despondent, and had lost as much as twenty pounds in weight about the time the will was made. He died September 20, 1949, his sixty-first birthday, on a country road in Missouri from gunshot. Verdict of the coroner's jury was suicide.

Testator lived most of his adult life down to the fall of 1943 in or near Winterset. In 1930 he and his family moved to a large farm near there. His first wife, whom he married in 1909, died in 1940. For several years his sons, especially the two oldest, worked on the farm and helped in a dairy business conducted from there. They received little pay. There is much evidence father and sons were on good terms. He spoke well of them and said they would be cared for at his death. Ralph, married, with two children, became totally disabled from tuberculosis contracted in World War II and lived on a government pension. He had worked hard on the farm and in delivering milk in Winterset thirteen years, for which he received almost no pay except his living.

In September 1941 testator advertised for a housekeeper. Proponent, who lived in St. Louis, was visiting in Des Moines, applied for and received the job and went to the farm to live.

She was seventeen years younger than testator and had been married twice. She divorced her second husband in St. Louis in March 1942 and married testator the following October 7.

About October 1, 1943, Mr. and Mrs. Farlow bought a locker plant at Scranton, Iowa, and proponent (Beulah) went there to operate it. Mr. Farlow left the farm and went to Scranton after crops were harvested and disposed of and a closing-out sale was held. Testator's bank account was charged with $4000, the amount paid for the Scranton property. Title was taken in Beulah's name and the bank account at Scranton was carried in her name.

In April 1944 this Scranton property was sold for $5000 which was deposited in a separate account in Beulah's name. In February 1944 Mr. and Mrs. Farlow purchased a home in Scranton for $4250. Title was taken in both as joint tenants. On March 1, 1945, this home was sold for $4650, which at Beulah's request was paid her. Beulah did "most of the talking about this deal, Mr. Farlow did not have much to say and Mrs. Farlow did not ask any of his advice."

After a year or more at Scranton the Farlows sold the locker plant there and went to Stuart, Iowa, where they bought a similar business. Title was taken in Beulah's name. We understand a home at Stuart was also purchased and title taken in Beulah's name. In 1945 the Stuart property was sold and a locker plant purchased at Denison. This included property at Defiance, Vail and Buck Grove. Title to all the properties was taken in proponent. Later, when testator tried to get the Denison property in his name, proponent told a witness she was going to keep it in her name.

The Farlows went to Denison to take over the locker plant there in March 1945 and remained until August 1949, when they moved to Missouri, about six weeks before testator's death. The Farlows purchased a residence at Denison in September 1945 and in November 1947 an acreage near there for $11,000. Title to both was taken in them as joint tenants.

In June 1949 the Denison plant was sold for $35,000— $20,000 cash was paid. The contract provided payments were to be made to proponent. Soon afterwards she withdrew $20,000 from the bank account at Denison and deposited it in her name

in a Des Moines bank. At testator's death the Farlows retained the locker plant at Defiance valued at $24,000, the property at Vail, both in Beulah's name, and the acreage near Denison held in joint tenancy, in addition to the Missouri property about to be mentioned.

After the will was made and the Denison plant sold, a tourist court near Fulton, Missouri, was purchased in testator's name for about $28,000. A cash payment of $16,000 was made from the $20,000 on deposit in the Des Moines bank. One thousand dollars was deposited from this account in a Missouri bank for operating expenses and the remaining $3000 was deposited in Beulah's name in Missouri.

There is little dispute as to the above matters. Those to which we will now refer are supported by substantial evidence, at least when viewed in the light most favorable to contestants.

While the Farlows were in the locker business Beulah was very active in managing it although she had no prior experience in such business. Testator had been a meatcutter for many years. Beulah kept the books (she had kept books in St. Louis) and handled the money. The jury could find she was "the boss" and dominated her husband. He did what she wanted him to do. While at Denison she frequently took from the cash drawer as much as $200 to $500 in currency and put it in her purse. Apparently she did not plan to deposit it in the business account in the bank. An automobile was purchased, at Beulah's insistence, and registered in her name. She said, "When I get ready to buy a car, I'll buy a car." Instead of asking testator to take her to a show she would announce "We are going to the show."

Proponent belittled testator and treated him with ridicule and contempt. He acted "like a whipped dog." She frequently referred to him as "the old son-of-a-b———." Several times she said she "wished the old s-o-b was dead." She tried to alienate testator's affection for his sons. One time when the son Ralph was sick and wrote his father for money she told an employee Ralph would get no money because she was watching both the cash and the checkbook. Testator refused a loan to another son after conferring with proponent. She repeatedly importuned testator to make a will, at least inferentially in her favor. She said "the damn boys would just fight over his property." Several

times she tried to get testator to make his life insurance payable to her rather than his sons.

The wife of an employee, herself a part-time employee at Denison, testified, "I have heard Mrs. Farlow make requests to her husband about making a will so many times I cannot remember the number, over a period from possibly late in 1946 and mostly through 1947. She would say to him in my presence 'You have to make a will.' I have heard her say she wanted him to make a will as she didn't want the boys fighting over the money after he was gone. The matter of his making a will always seemed to come back into the conversation." Proponent asked this witness's husband if she should not "see a lawyer and see the things fixed up because she was afraid the boys would get the money if she didn't."

Soon after proponent started work for testator and especially after their marriage he became much less friendly with his sons than before and there was little social intercourse between them. The jury could find this change was inspired by proponent. A witness said, "I heard Mrs. Farlow say she never wanted Ralph's boys there, they were always too much work for her, the kids got on her nerves." (Testator's name was Ralph too.) Before proponent came to the farm testator used to visit at the home of his first wife's sister at Winterset almost daily. The visits then stopped.

In July 1948 testator went to an attorney at Denison who prepared a will for him which was duly executed, leaving his entire estate to proponent. He asked the attorney if it was necessary to mention his sons in the will if they were to receive nothing under it and the attorney said it was not. On March 25, 1949, testator went to the same attorney and said he wanted to make another will. Asked why he wanted another will testator said he wanted to be sure his sons got nothing and he believed unless they were mentioned in the will it would be set aside. The attorney assured testator "there is nothing to that, but if it would put his mind at ease another will should be drawn."

The will in question was then prepared and executed, leaving $100 to each of the three sons and the rest of the estate to proponent. This will was found in testator's pocket by the undertaker at the time of his death September 20, 1949.

20

The jury could readily find it was proponent's idea it was necessary to make some provision in the will for the sons and she convinced testator of this notwithstanding the attorney twice advised him to the contrary. Proponent destroyed the earlier will in testator's presence in the fall of 1948 because it made no provision for the sons and she thought for that reason it would not "stand up" in court. After testator's death proponent said a will was found on his person but she did not know what it provided. In fact she was fully aware of its contents.

We deem it unnecessary to refer to other evidence tending to show proponent dominated testator in various ways. The testimony comprises about one hundred eighty-five pages of the record. We are not concerned with evidence for proponent which contradicts some evidence above referred to. Much of it is negative in character by witnesses who say, in substance, they observed nothing unusual in proponent's conduct toward testator. Of course the jury had a right to believe contestants' evidence in spite of the conflict. See In re Estate of Rogers, supra, 242 Iowa 627, 631, 47 N.W.2d 818, 820, 821; Shaw v. Duro, 234 Iowa 778, 781, 14 N.W.2d 241, 243; In re Will of Busick, 191 Iowa 524, 528, 182 N.W. 815.

While this may be a borderline case we are inclined to hold there is substantial evidence of undue influence and we should not interfere with the judgment. Although, as stated, there is no evidence testator was of unsound mind, the jury could properly find he had been so worn down by proponent's domination of him that he was plainly subject to undue influence. There is ample evidence proponent had opportunity and disposition to exercise such influence and the will appears to be the result thereof. See In re Estate of Telsrow, supra, 237 Iowa 672, 678, 679, 22 N.W.2d 792, 797; In re Will of Soderland, 239 Iowa 569, 578, 30 N.W.2d 128, 133.

Though many of the incidents referred to in evidence seem rather trivial the combined effect of the proven circumstances is such as to make the issue of undue influence for the jury. From the whole record the finding is warranted that proponent waged an aggressive campaign from the start to get testator's property into her own name and to procure this unjust and unnatural will which was really her will, not his. Not until after

the will was obtained did proponent permit property (the Missouri tourist court) to be taken in testator's name.

Decisions which lend support to our conclusion upon somewhat similar facts include In re Estate of Hurlbut, 242 Iowa 353, 357, 46 N.W.2d 66, 68, where we say "The evidence would warrant an inference that proponent conceived a plan to get deceased's property almost from the time she met him and learned of his property."; In re Estate of Coe, 234 Iowa 1113, 15 N.W.2d 278, and comment 30 Iowa Law Review 321; Shaw v. Duro, supra, 234 Iowa 778, 14 N.W.2d 241; In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318; In re Estate of Ensminger, 230 Iowa 80, 296 N.W. 814; In re Estate of Brooks, 229 Iowa 485, 294 N.W. 735, where we held *upon a review de novo* of quite similar facts the will was procured by undue influence; In re Will of Busick, supra, 191 Iowa 524, 182 N.W. 815.—Affirmed.

OLIVER, C. J., and BLISS, SMITH, MULRONEY, HAYS, and THOMPSON, JJ., concur.