Lewis K. **JOHNSTONE**, Appellant,

v.

Helen S. **JOHNSTONE** et al., Appellees.

No. 54523.

Supreme Court of Iowa.

Sept. 27, 1971.

**422**

Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, for appellant.

Walker, Concannon & Hendrickson, Keokuk, for appellees.

STUART, Justice.

This is a will contest. Edward K. Johnstone of Keokuk died testate on December 31, 1966. By the terms of his will executed December 31, 1965, testator gave a few small specific bequests including $100 each to the son born of his first marriage, Lewis K. Johnstone, contestant herein, and his second wife's adopted daughter, Marilyn G. Youmans King. Half of the balance of testator's estate was left to his second wife, Helen S. Johnstone, outright. The other half was left in trust with Mrs. Johnstone having the income for life. Upon her death, 10% of the remaining estate is to go to Emelie Brooks Johnstone Saltsman, testator's daughter from his first marriage and sister of contestant. The remaining portion of the estate is kept in trust for and gradual distribution to testator's son from his second marriage Edward K. Johnstone, II.

Johnstone was 75 at the time of his death. He was the president of the Keokuk Savings Bank, a position he had held since 1931. There is no allegation that Mr. Johnstone was not competent to execute a will and absolutely no evidence to show that he was incompetent if the point had been raised. Contestant based his case solely on the grounds that his stepmother had exerted undue influence upon his father.

The trial court directed a verdict and entered judgment thereon against contestant on the grounds that there was no showing that the testator was unquestionably subject to undue influence. Contestant has appealed. We affirm.

I. The principal issue raised by this appeal is whether the trial court erred in holding there was not sufficient evidence of undue influence to raise a jury question. Contestant also claims the court erred in excluding certain testimony and exhibits. Under the view we take of this case, it is not necessary to further enumerate or discuss these alleged evidentiary errors. It is our opinion that even if the excluded evidence is considered, there still is not sufficient evidence to generate a jury question on undue influence. If we consider all the evidence offered any error in failing to admit it is without prejudice. In re Grahlman's Will (1957), 248 Iowa 535,

546, 81 N.W.2d 673, 680; Zinkula v. Zinkula (1915), 171 Iowa 287, 307, 154 N.W. 158, 165. Accordingly, we shall proceed to set out the facts in this case without distinguishing between the evidence properly admitted and that supplied by offer of proof assuming *arguendo* that all the excluded testimony and exhibits could properly have been considered by the trial court.

Johnstone was divorced from his first wife in 1931. The decree provided for split custody of his two children, Lewis and Brooks, then 12 and 10 respectively. The children spent summers and Christmas vacations in Keokuk every year following the divorce through 1934, the year their father remarried. The rest of the time was spent with their mother in Cincinnati. The evidence shows there was a good relationship between father and son until the father's remarriage. The first time Lewis visited his father's home after his remarriage, during the holidays of 1934, he had some difficulties with the present Mrs. Johnstone.

Contestant testified that his new stepmother did not think some of his friends were good enough for him. Marilyn King mentioned an incident that occurred about this time when her mother ran off several of Lewis's friends after they had apparently become somewhat rowdy.

Marilyn remembered one occasion when Lewis and her mother "were having a heated argument". According to Marilyn there was always arguments between the two when Lewis was home. After a series of incidents, there was what Brooks described as a "blowup". Lewis cut short his stay although Brooks remained and finished out her visit.

Lewis testified with regard to this visit that: "There were other incidents during the five or six days I was visiting with Mrs. Johnstone after me for one reason or another, and my stay came to an abrupt halt. I had worked in Keokuk the summer of 1934 and had saved enough money to buy a Model A Ford. The Ford was left in Keokuk and I was not allowed to drive it when I was home because of insurance and weather factors—and I had not driven it. The situation between Mrs. Johnstone and myself got so bad, I took the car and drove home to Cincinnati."

Lewis did not return to Keokuk at all during 1935. However, his sister continued to visit in the Edward Johnstone home. He returned to Keokuk in the summer of 1936 to talk to certain people about recommendations to accompany his application to Dartmouth. Marilyn King testified although Lewis was not staying at the home, she had seen Lewis with his father down at the bank and had observed that "they were quite happy". He did not see his stepmother on this trip as she was in Iowa City for the birth of Edward K. Johnstone, II.

Lewis came to the home again in 1937 while he was a senior in high school and again the visit was a stormy one. The following is Lewis's description of the circumstances surrounding this visit:

"I made another trip to Keokuk in February, 1937, during the flood and Brooks was along on that trip. The schools were temporarily closed during this period (four days, a week or ten days—whatever it took to get things back into operating order). Mrs. Johnstone told me I had to go to school during that visit, and that she would not have me in the house. I told her I was not going to school because it was my senior year and that I was going back to my school in five or six days and pick up where I left off. I did not go to school there during my visit and I returned to Cincinnati earlier than had been scheduled. * * *"

His sister Brooks testified: "I remember there was a flood in 1937 and Lewis came along on the trip for us to go to school here for a short time. There was unpleasantness with respect to Lewis and Mrs. Johnstone on that trip."

She added: "I know there had been other incidents. The other incidents I mention

would have been either on the visit at the time of the flood or during the visit in 1934. The specific incidents I recall were something about ink that had inadvertently gotten on the wallpaper, and there was quite a blowup about that. There was a time I felt Lewis was not being polite enough to people, as did Aunt Helen, but I can't remember the exact time.

"My remembrance is that there were some ink spots on the wall of the stairway between the first and second floors. Aunt Helen thought Lewis had put them there and was exceedingly angry about it. There were many words spoken between them."

On cross-examination the witness again stated, " * * * that Aunt Helen did not feel Lewis was polite enough. Lewis was rude. Lewis and Mrs. Johnstone did not get along."

Marilyn King testified that, "In connection with the visit that Lewis made in the household when he came to Keokuk to school during the flood, there was conversation by my mother that maybe Lewis should go to reform school. I don't know whether Lewis was told this or not and it was not a conversation to me."

Apparently, Lewis was in the Keokuk area "once or twice in 1938, 1939 and 1940" visiting his father's half sister, Florence Ervin, and her family, but he was not at the Johnstone residence during this period. Lewis was then attending college. He graduated from Dartmouth and went on to the Tuck School of Business. His father and stepmother were invited to both graduation ceremonies, but attended neither. They were also invited to his wedding in December of 1941, but sent their regrets.

Lewis served in the Navy during the war He corresponded with his father during this period; this correspondence is characterized by appellant as "warm and frequent". Around Christmas time in 1945 Lewis was awaiting his discharge from the Navy. Plans were made for him to bring his wife and young son to the Johnstone

home for a visit. The visit never materialized. According to contestant's version, Mrs. Johnstone became miffed and cancelled the visit when he and his wife could not come when they had originally intended.

This explanation of what happened is supported by Marilyn King's testimony. She testified that her mother had told her she was not very pleased that they were coming and that after they did not come on the date that had been set, she did not want them to come at all.

The witness further testified that "my mother told my father she wouldn't have them in the house and that if they came she went. She said that if they did come she would leave and give him a harder time than his first wife. She mentioned divorce. Mr. Johnstone told Mrs. Johnstone he would tell them not to come or that she could."

Lewis continued to send occasional letters and Christmas gifts after 1945. Most of the presents and pictures of Lewis's children sent in 1945 or 1946 were returned.

Marilyn King testified that the testator had been "excited about the packages and really wanted to open them, but he knew that Helen Johnstone wouldn't let him". On one occasion, according to her testimony, Mrs. Johnstone was out of the room and testator had Marilyn open some of the packages. She testified that Mr. Johnstone had tears in his eyes when Mrs. Johnstone came into the room and an argument had ensued when Mrs. Johnstone had said she did not liike it that they had been opened.

Marilyn had also testified that her mother had worried a great deal at the time of the 1938 custody hearing about how much it was costing to support testator's children and that her mother had talked against Lewis then.

She related other testimony which supposedly showed her mother's disposition to use undue influence. Marilyn told how Mrs. Johnstone had visited a wealthy widow, Annie Hulbert, in Chicago every

couple of months in hopes she would be left her money. "She said that when Annie Hulbert died she would maybe have more money for herself". Marilyn went on to state that all Mrs. Hulbert had left her mother was a fur coat and a few other articles of clothing and her mother had not been too happy about it. Mrs. Johnstone often visited Mrs. Hulbert since she was "a very dear friend of my family's". In fact, testator and Helen Johnstone had been married in Mrs. Hulbert's home.

Another incident that supposedly illustrates Mrs. Johnstone's greedy and grasping nature is that she had Marilyn sign notes to her for money advanced to Marilyn to finance her nurse's training. Mrs. Johnstone was Marilyn's guardian, and the notes were paid out of her guardianship funds. Marilyn had not been on very good terms with her mother for several years. She testified that there had been a breakdown in their relationship after "some misunderstandings" arose during a visit back in 1952.

Lewis Johnstone continued to visit other relatives in Keokuk until his father's death, but he saw his father only one more time. In 1954 Lewis and his wife were visiting his Aunt Florence and Uncle Jack Ervin. The Ervins had been invited to the Edward Johnstone's for a picnic dinner. Lewis received permission to visit the Johnstone home. The visit was apparently cordial enough though it only lasted for about an hour. Lewis's wife testified that testator followed them to the door and conversed shortly with his son. She stated that she observed tears in her father-in-law's eyes and overhead him tell Lewis he was glad they had come and wished that they would come again. .

Afterwards, however, Edward Johnstone wrote Lewis a letter saying that in view of the circumstances it would be better if there were no further visits.

The will under attack was executed in the offices of Shuttleworth and Ingersoll at Cedar Rapids on December 31, 1965. It contains complex provisions evidencing thorough estate planning. Mrs. Johnstone had accompanied her husband to Cedar Rapids, and was apparently in and out of the office while the will was being drawn up and executed.

II. We have repeatedly stated the rules of law applicable to the issue of undue influence in the execution of a will. In re Estate of Cory (Iowa, 1969), 169 N.W.2d 837, 842–843; In re Estate of Latch (Iowa, 1968), 162 N.W.2d 465, 469–470; In re Estate of Roberts (1966), 258 Iowa 880, 888–889, 140 N.W.2d 725, 730.

We need not repeat them here as we are concerned only with one of the elements which must be present to justify submission of the issue of undue influence to the jury. The trial court directed a verdict on the ground that the evidence failed to generate a jury question as to whether Mr. Johnstone was "unquestionably subject to undue influence".

The use of "unquestionably subject to undue influence" first appears in In re Ankeny's Estate (1947), 238 Iowa 754, 28 N.W.2d 414, which cites a comment in 30 Iowa Law Review 321 quoting from In re Leisch's Will (1936), 221 Wis. 641, 267 N.W. 268, in which that phrase is used in enumerating four elements necessary to prove undue influence. It does not appear that the phrase has been repeated in the Wisconsin cases. They now use the term "susceptible of being unduly influenced". In re Estate of Perssion (1963), 20 Wis.2d 537, 123 N.W.2d 465, 466, 13 A.L.R.3d 373, 376; Kuehn v. Kuehn (1960), 11 Wis.2d 15, 104 N.W.2d 138, 142. See also In re Elliott's Estate (1915), 162 Wis. 249, 155 N.W. 110, 111.

A majority of the court believes this quoted phrase, which has appeared as recently as In re Estate of Cory, supra, if literally applied, would make it almost impossible to prove undue influence and that it is too strong a statement for the showing this court has actually required in order to

make a case for the jury. In re Ramsey's Estate (1960), 252 Iowa 48, 50, 105 N.W. 2d 657, 658; In re Farlow's Estate (1951), 243 Iowa 15, 20–21, 50 N.W.2d 561, 564; In re Soderland's Estate (1947), 239 Iowa 569, 575–578, 30 N.W.2d 128, 131–132. We believe it is more accurate to state that the contestant must show that the testator was "susceptible to *undue* influence". In re Burrell's Estate (1959), 251 Iowa 185, 196, 100 N.W.2d 177, 184 (subject to dominance); In re Dashiell's Estate (1959), 250 Iowa 401, 406, 94 N.W.2d 111, 114 (clearly subject to undue influence); In re Farlow's Estate, supra, 243 Iowa at 20, 50 N.W.2d at 564 (plainly subject to undue influence); In re Soderland's Estate, supra, 239 Iowa at 575, 578, 30 N.W.2d at 131 (more susceptible to), 133 (subject to); Hansen v. Waugh (1946), 237 Iowa 304, 316, 21 N.W. 2d 762, 768 (susceptibility to); Iowa Uniform Jury Instructions 7.1 and 7.2.

In stating this element of undue influence in this language, we do not mean to indicate a different result would have been reached had it been used in relation to the facts of previously decided cases. We are attempting to conform the language to the standard applied to the facts rather than change the law.

Nor does the restatement of the requirements of this element of undue influence affect the result in this case. Giving all of contestant's offered evidence the most favorable construction it will bear, R.C.P. 344(f) (2), we do not believe there was sufficient evidence of Mr. Johnstone's susceptibility to undue influence to raise a question for the jury.

"*Undue* influence means something more than and different from the natural, wholesome, relationship between wife and husband concerning their mutual interests. The influence growing out of such relation is manifestly not ordinarily 'undue' or improper." Gillette v. Cable (1956), 248 Iowa 7, 18, 79 N.W.2d 195, 202.

■ Importunity, request and persuasion that do not go to the point of controlling the will of the testator do not constitute such undue influence as will invalidate a will. In re Lochmiller's Estate (1947), 238 Iowa 1232, 1235–1236, 30 N.W.2d 136, 139; Walters v. Heaton (1937), 223 Iowa 405, 408, 271 N.W. 310, 313; In re Johnson's Estate (1936), 222 Iowa 787, 798, 269 N.W. 792, 798.

Mr. Johnstone was a highly respected businessman and banker in Keokuk. He was president of the Keokuk Savings Bank when he died. There is no evidence of mental weakness and the only evidence of any dominion over his judgment by Mrs. Johnstone is the testimony as to her attitude on the custody matter, the cancelled visit in 1945 and the unopened Christmas presents. Mr. Johnstone's mental strength and business acumen have a direct bearing on this issue as conduct which might be sufficient to influence a person of mental weakness would fall short of influencing a person like Mr. Johnstone. In re Estate of Cory (Iowa, 1969), 169 N.W.2d 837, 843; In re Estate of Telsrow (1946), 237 Iowa 672, 677–678, 22 N.W.2d 792, 796.

Letters from Mr. Johnstone to Lewis do not aid Lewis's case  Most are polite and cordial, but the letter written January 18, 1946 discloses personal dissatisfaction with Lewis's attitude toward Mr. and Mrs. Johnstone. A copy of this letter was again sent to Lewis in 1948 when Mr. Johnstone returned two of Lewis's letters to him unopened.

On May 26, 1953, he wrote Lewis the following letter:

"Dear Lewis:—

"It has come to my attention that you called on Eddie at Hotchkiss on Monday May 25th without his invitation or even his knowledge of who you were.

"I demand that in as much as our relationship is what it is because of your choosing, that you do not further attempt to embarass me, my wife or my son Edward.

"Your Father, Edward K. Johnstone

"I have advised Edward of my feelings in this matter and have forbidden him to have any further contact with you. E. K. J."

Following the cordial but brief visit in his father's home, Lewis received a letter dated June 3, 1954, which was the last contact between the father and son shown in the record.

"Lewis:—

"Since your visit in our home on Monday I have thought deeply of your relationship with us. We were glad to meet Carolyn. You are fortunate to have such a nice girl for a wife. From the pictures of your children—which are the first I've ever seen—I take them to be healthy fine normal youngsters. My wife and I wish you well and desire for you all the good things in life.

"I wrote you fully about my feelings after your visit to Eddie at Hotchkiss last spring. I have written you before on kindred subjects. After this visit I am sure that I prefer that you live your life with your family as you see fit and have no further contacts with me, Eddie or his mother. Edward K. Johnstone"

There is nothing in the record to show these were written under the influence of Mrs. Johnstone. There is no hint of a reluctant compliance with her wishes. On the contrary, they appear to be the thoughts of a strong willed man who was exercising his own judgment.

■ There was not sufficient evidence to raise a jury question as to whether the testator was susceptible to undue influence.

III. In view of our holding on this point we need not discuss or decide the sufficiency of the evidence to raise a jury question on the other necessary elements or the effect of the passage of 21 years between the events testified to and the execution of the will.

Although it is difficult to compare circumstances in different cases we believe there was no more evidence to support a verdict of undue influence here than in In re Estate of Latch (Iowa, 1968), 162 N.W. 2d 465; In re Estate of Roberts (1966), 258 Iowa 880, 140 N.W.2d 725; Hart v. Lundby (1965), 258 Iowa 46, 137 N.W.2d 642; In re Burrell's Estate (1959), 251 Iowa 185, 100 N.W.2d 177 and In re Grahlman's Will (1957), 248 Iowa 535, 81 N.W. 2d 673, in which cases the evidence was held insufficient to raise a question for the jury on undue influence.

■ We conclude that there was not sufficient evidence to raise a jury question of undue influence when the evidence offered, but not admitted, is considered. Any error in rulings on such evidence is therefore without prejudice.

The trial court's ruling on defendant's motion for directed verdict was correct.

Affirmed.

All Justices concur.